**FRESNO RIFLE AND PISTOL CLUB, INC., et al., Plaintiffs–Appellants,**

v.

**John K. VAN DE KAMP, Esq., in his official capacity as Attorney General of the State of California, Defendant–Appellee.**

**No. 91–15466.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 16, 1992.

Decided May 22, 1992.

Stephen P. Halbrook, Fairfax, Va., for plaintiffs-appellants.

Daniel G. Stone, Deputy Atty. Gen., Sacramento, Cal., for defendant-appellee.

Don B. Kates, Jr., Benenson and Kates, Novato, Cal., for amici Law Enforcement Alliance of America, Congress of Racial Equality, and Second Amendment Foundation.

Robert C. Vanderet, O'Melveny & Myers, Los Angeles, Cal., for amici Center to Prevent Handgun Violence Legal Action Project, Peace Officers Research Ass'n of California, California Police Chiefs Ass'n, California Peace Officers Ass'n, National Fraternal Order of Police, National Ass'n of Police Organizations, International Ass'n of Chiefs of Police, Major Cities Chiefs, National Organization of Black Law Enforcement Executives, and Police Executive Research Forum.

Before: SCHROEDER, LEAVY and RYMER, Circuit Judges.

RYMER, Circuit Judge:

Several local, state, and national clubs which sponsor shooting competitions and represent the interests of firearm owners, individuals who own or wish to purchase firearms to use in the federal Civilian Marksmanship Program, and two gun manufacturers who make firearms which are designated as "assault weapons" and are regulated by California's Roberti–Roos Assault Weapons Control Act of 1989 ("AWCA"), Cal.Penal Code §§ 12275–12290, seek a declaration that the AWCA is preempted by the Civilian Marksmanship

Program ("CMP"), 10 U.S.C. §§ 4307–4313; that the AWCA is an unconstitutional bill of attainder under Article I, section 10, clause 1 of the United States Constitution; and that the AWCA infringes upon their right to bear firearms under the Second Amendment. The district court dismissed their complaint under Fed.R.Civ.P. 12(b)(6), *Fresno Rifle and Pistol Club, Inc. v. Van de Kamp,* 746 F.Supp. 1415 (E.D.Cal.1990), and the plaintiffs now appeal. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I

The AWCA proscribes the manufacture, sale, transfer, possession, distribution, transportation, and importation of numerous firearms without a permit. It was enacted in 1989 as a result of the California Legislature's finding "that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state." AWCA § 12275.5. As amended in 1991,[1] the AWCA classifies as assault weapons twenty-one categories of rifles, eight categories of pistols, and three categories of shotguns. AWCA § 12276. The Legislature found "that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." AWCA § 12275.5. The Act permits the state Attorney General to seek future judicial declarations that firearms other than those specifically identified qualify as assault weapons. AWCA § 12276.5.

Under the Act, any person who lawfully possessed an assault weapon prior to June 1, 1989, and any person who possesses a firearm prior to the date it is categorized as an assault weapon under § 12276.5, must register the firearm with the California Department of Justice. AWCA § 12285. These persons generally may possess the weapon only at their residence or place of business; at shooting clubs, target ranges, and exhibitions; and while

---

1. Only one of the 1991 amendments is pertinent to this appeal. *See infra* Part II.

transporting the weapon between any of these places. AWCA § 12285(c). All other persons—including those persons who possessed an assault weapon prior to June 1, 1989, but wish to use it in a manner not authorized by § 12285—must obtain a permit from the Department of Justice. AWCA § 12286.

The complaint alleges that the AWCA is preempted by two different federal statutory schemes; that it violates both the state and federal constitutions by depriving the plaintiffs of privileges and immunities, their personal right to bear arms, their right of privacy, and their privilege against self-incrimination; and that it constitutes a bill of attainder. The Attorney General moved to dismiss, and the plaintiffs moved for a temporary injunction. The district court consolidated the two for hearing, denied the request for injunctive relief, and dismissed the complaint in its entirety. *Fresno Rifle,* 746 F.Supp. at 1427. The plaintiffs' motion to alter or amend the judgment was subsequently denied.

The plaintiffs appeal only that part of the order dismissing their claims that the AWCA is preempted by the CMP, impermissibly infringes their Second Amendment rights, and unconstitutionally inflicts punishment on the gun manufacturers within the meaning of the Bill of Attainder Clause.[2] We review de novo the district court's dismissal under Rule 12(b)(6). *Abramson v. Brownstein,* 897 F.2d 389, 391 (9th Cir.1990).

## II

■ The plaintiffs contend that the AWCA is preempted by federal legislation under the Supremacy Clause of the federal Constitution. They argue that Congress has the exclusive power under Article I, section 8 of the Constitution "[t]o raise and support armies" and "[t]o provide for organizing, arming, and disciplining, the Militia." Pursuant to that power, Congress established the CMP in the early 1900s "to create interest in marksmanship training among U.S. men of military age." U.S. General Accounting Office, Report to the Chairman, Committee on Armed Services, House of Representatives: *Military Preparedness–Army's Civilian Marksmanship Program is of Limited Value* 1 (1990) [hereinafter "GAO Report"]. The program authorizes "(1) a Director of Civilian Marksmanship [to serve under the auspices of the Secretary of the Army], (2) an affiliated club system, (3) rifle competitions [and instruction], (4) annual National Matches [held with the assistance of the] National Rifle Association (NRA), and (5) the sale of weapons to affiliated club members."[3] *Id.* at 2. The plaintiffs argue that the AWCA prohibits the rifles which the CMP and its implementing regulations, 32 C.F.R. pts. 543–544, encourage civilians to obtain and use in rifle matches, and thus materially impairs their ability to sponsor matches and engage in competitive events as contemplated by the federal program. In that respect, they urge, California's law interferes with promotion of the national defense and is preempted.

Preemption "in the first instance turn[s] on congressional intent." *Wisconsin Pub. Intervenor v. Mortier,* —— U.S. ——, ——, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991). Absent explicit language indicating an intent to preempt,

> Congress' intent to supersede state law in a given area may nonetheless be im-

**2.** Amici curiae have also appeared. The Center to Prevent Handgun Violence Legal Action Project, Peace Officers Research Association of California, California Police Chiefs Association, California Peace Officers Association, National Fraternal Order of Police, National Association of Police Organizations, International Association of Chiefs of Police, Major Cities Chiefs, National Organization of Black Law Enforcement Executives, and Police Executive Research Forum have appeared in support of the state of California. The Law Enforcement Alliance of America, Congress of Racial Equality, and Second Amendment Foundation have appeared in support of the plaintiffs.

**3.** Congress appears to be shying away from the Program's original goals, for the CMP was amended in 1990 to require participants to provide financial support for the matches and to prohibit the Army from constructing new ranges. *See* 10 U.S.C. § 4308(a)(1), (a)(5), *as amended by* Pub.L. No. 101–510, 104 Stat. 1533 (1990); *cf.* GAO Report at 1 (CMP is of "limited value").

plicit if a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," if "the Act of Congress ... touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or if the goals "sought to be obtained" and the "obligations imposed" reveal a purpose to preclude state authority.

*Id.* 111 S.Ct. at 2481–82 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). When considering preemption, we must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 2482 (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152).

Nothing in the CMP or its implementing regulations suggests that Congress intended to supersede state gun control measures such as the AWCA. The CMP does not declare an intention to preempt state law. Nor is the CMP "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement" the field. *Id.* at 2481 (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152). The Program merely encourages citizens to undergo marksmanship training in voluntary shooting matches. This goal does not "reveal a purpose to preclude state authority." *Id.* at 2482.[4]

Even if Congress did not manifest an intent to occupy the field of gun control, the plaintiffs claim that the AWCA conflicts with 32 C.F.R. § 544.52(c) and is therefore preempted because it is impossible for competitors to compete without access to weapons used in the CMP matches. *See Mortier,* 111 S.Ct. at 2482 (preemptive conflict arises when "compliance with both federal and state regulations is a physical impossibility" or when state law is obstacle to accomplishment of congressional purposes) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963)). They point to the regulation which authorizes use of commercial equivalents of the M16:

> US rifle, caliber 5.56mm M16 series. Competitors may use the caliber 5.56mm M16 series as issued by the US Armed Forces or a commercial rifle of the same type and caliber.[5]

32 C.F.R. § 544.52(c). The plaintiffs claim that the Colt AR–15 Sporter, which is listed as an assault weapon under AWCA § 12276(a)(5), is a valid commercial equivalent of an M16 under 32 C.F.R. § 544.52(c), but that the AWCA deprives them of the opportunity to use it even though it is one of the three rifles authorized for use in the CMP.

Assuming that the Colt AR–15 Sporter rifle qualifies as a commercial equivalent of the M16 for purposes of the CMP, the CMP and the AWCA do not "actually conflict." *Mortier,* 111 S.Ct. at 2482. At most, the AR–15 Sporter is but one of the weapons authorized for use in the CMP. It is not *required* for use in the CMP. Nor does the AWCA prohibit anyone from obtaining the "caliber 5.56mm M16 series as issued by the US Armed Forces." 32 C.F.R. § 544.52(c); *cf.* 10 U.S.C. § 4308(a)(5), *as amended by* Pub.L. No. 101–510, 104 Stat. 1533 (1990) (providing for sale of army rifles to CMP competitors at fair market value); 32 C.F.R. § 544.53 (providing for temporary loan of army rifles and pistols).

---

4. For whatever it is worth, we note that Congress expressly disavowed any intent to occupy the field of gun control in the Gun Control Act of 1968, 18 U.S.C. §§ 921–930. *See* 18 U.S.C. § 927; *cf.* H.R.Rep. No. 1577, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4411 ("The principal purpose of [the Gun Control Act of 1968] is to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders.") The Gun Control Act of 1968 also requires compliance with state and local gun control laws. *See* 18 U.S.C. § 922(b)(2)–(3).

5. In addition to the M16, the federal regulations allow competitors in the National Trophy matches to use M1 and M14 rifles, and M1911A1 pistols. *See* 32 C.F.R. § 544.52(a), (b), & (d). The plaintiffs do not contend that the AWCA impairs their ability to compete with these rifles and pistols.

The plaintiffs argue that even if they are allowed to use army M16 issues at CMP shooting matches, the state has effectively abrogated their right to compete in the CMP by prohibiting them from practicing with the AR–15 Sporter. They are free, however, to persuade the army to let them practice with the army issues that are available at competitions, or to compete with the M1 or M14 rifles. The AWCA therefore does not make competing in or complying with the CMP a "physical impossibility," or "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Mortier*, 111 S.Ct. at 2482 (citations omitted).

Because Congress has manifested no intent to preempt state gun-control efforts, and because the AWCA does not interfere with the congressional objective of encouraging civilian marksmanship as preparation for military service, the CMP does not preempt the AWCA.

### III

■ Two of the plaintiffs—Springfield Armory, Inc., and Heckler and Koch, Inc.— manufacture guns that are among those enumerated in the AWCA. *See* AWCA § 12276(a)(9) ("HK–91, HK–93, HK–94, HK–PSG–1"); § 12276(a)(13) ("Springfield Armory BM59 and SAR–48").[6] The manufacturers claim that the Act's identification of their guns by trade name renders the AWCA an unconstitutional bill of attainder under Article I, section 10, clause 1 of the United States Constitution ("No State shall ... pass any Bill of Attainder....").

The "key features of a bill of attainder" are that the challenged law "legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977) (congressional act directing the GSA to take custody of Presi-

dent Nixon's papers and tape recordings not bill of attainder). "Forbidden legislative punishment is not involved merely because the Act imposes burdensome consequences. Rather, we must inquire" whether the California Legislature "inflict[ed] punishment" upon the manufacturers within the meaning of the Bill of Attainder Clause. *Id.* at 472, 97 S.Ct. at 2805 (quoting *United States v. Lovett*, 328 U.S. 303, 315, 66 S.Ct. 1073, 1078, 90 L.Ed. 1252 (1946)).

Both Springfield Armory and Heckler and Koch argue that the legislature tried them and found their products to be "assault weapons." They construe this action to be a sentence rather than a law. Further, they argue that because anyone else can make identical firearms, they are subjected both to criminal penalties specific to themselves and to punishment in the form of economic loss.

■ An otherwise valid law is not transformed into a bill of attainder merely because it regulates conduct on the part of designated individuals or classes of individuals. "However expansive the prohibition against bills of attainder, it surely was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals." *Id.* at 471, 97 S.Ct. at 2804 (footnote omitted). By necessity, many laws are directed at specified individuals. For example, "conflict-of-interest laws, which inevitably prohibit conduct on the part of designated individuals or classes of individuals, do not contravene the bill of attainder guarantee" by virtue of their specificity. *Id.* at 471 n. 34, 97 S.Ct. at 2804 n. 34. Thus, the *Nixon* Court concluded that "the Act's specificity—the fact that it refers to [President Nixon] by name—does not automatically offend the Bill of Attainder Clause." *Id.* at 471–72, 97 S.Ct. at 2804–05. Similarly, the AWCA's specificity in naming weapons made by Springfield Armory and Heckler and Koch among those of other manufacturers does

---

**6.** Before the AWCA was amended in 1991, § 12276(a)(9) read: "Heckler & Koch HK–91, HK–93, HK–94, and PSG–1." In amending the AWCA, the Legislature also replaced the phrase

"firearms known by trade" with "designated semiautomatic firearms" in the introductory sentence to § 12276.

not render the AWCA a bill of attainder. *Cf. id.* at 472, 97 S.Ct. at 2805 (it is constitutionally significant that the legislation "casts a wider net"). Other weapons, in addition to those identified, may later be deemed to be "assault weapons." *See* AWCA § 12276.5. Thus, we cannot say that the Legislature intended to punish specific individuals; rather, its intent was to control types of weapons.

Springfield Armory and Heckler and Koch complain that they are attainted because the Legislature has determined, without judicial scrutiny, that certain firearms they manufacture are "assault weapons." The Legislature has not, however, specified punishment based only on proof of the manufacturers' identity. Instead, it has precluded persons from manufacturing, distributing, selling, or possessing particular firearms which it has found are particularly dangerous. The critical question, therefore, is whether the kind of "economic punishment" inflicted on Springfield Armory and Heckler and Koch is of the sort prohibited by the Constitution.

We are to make three inquiries in determining whether a statute inflicts punishment that implicates the Bill of Attainder Clause:

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a[n] ... intent to punish."

*Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 852, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984) (statute denying federal student aid to males who fail to register for draft does not inflict punishment within meaning of Bill of Attainder Clause) (quoting *Nixon*, 433 U.S. at 473, 475–76, 478, 97 S.Ct. at 2806–07, 2808).

Considering these factors, we conclude that neither Springfield Armory nor Heckler and Koch has been impermissibly punished. Traditional punishments include "imprisonment," "banishment," "punitive confiscation of property," and prohibition of "designated individuals or groups from participation in specified employments or vocations." *Nixon*, 433 U.S. at 474, 97 S.Ct. at 2806. The type of economic punishment about which Springfield Armory and Heckler and Koch complain is not of the type "traditionally judged to be prohibited by the Bill of Attainder Clause." *Id.* at 475, 97 S.Ct. at 2806. There is no indication that Springfield Armory or Heckler and Koch manufacture weapons in California, or that either manufactures only the weapons regulated by the AWCA. Nor is there any indication that the AWCA prevents Springfield Armory or Heckler and Koch from continuing to manufacture the regulated weapons. Thus, the economic punishment about which they complain, even if cognizable, is indirect and in no way amounts to punitive confiscation.

Second, the AWCA "reasonably can be said to further nonpunitive legislative purposes." *Id.* at 475–76, 97 S.Ct. at 2806–07. In light of the Legislature's concern that assault weapons present an unreasonable danger of harm to human life, "legitimate justifications for passage of the Act are readily apparent." *Id.* at 476, 97 S.Ct. at 2807; *cf. id.* at 475–76 & n. 40, 97 S.Ct. at 2806–07 & n. 40 (this second test is a "functional test of the existence of punishment" that is applied by examining the purposes behind the challenged law).

Finally, nothing in the AWCA "evinces a[n] ... intent to punish." *Id.* at 478, 97 S.Ct. at 2808. There is no indication that the Legislature's motivation was anything other than a legitimate desire to protect the safety and welfare of the citizens of California.

The manufacturers rely on *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), to argue that the Legislature can only punish generic conduct, but their reliance is misplaced. In *Brown*, the Court held that Communist Party members were attainted by a congressional act barring them from holding offices in labor unions. The law in question, the Labor–Management Reporting and Disclosure Act of 1959, "ma[de] it a crime for a member of the Communist Party to serve as an officer or (except in clerical or custodial positions) as an em-

ployee of a labor union." *Id.* at 438, 85 S.Ct. at 1709. *Brown*, however, "left undisturbed the requirement that one who complains of being attainted must establish that the legislature's action constituted punishment and not merely the legitimate regulation of conduct." *Nixon*, 433 U.S. at 476 n. 40, 97 S.Ct. at 2807 n. 40. The Communist Party members in *Brown* met this requirement by showing that the Labor–Management Reporting and Disclosure Act of 1959 was designed to "inflict[ ] deprivations on ... blameworthy or tainted individual[s] in order to prevent [their] future misconduct." *Id.* As the Court in *Nixon* recognized, this was an impermissible punitive objective under the "functional test of the existence of punishment." *Id.* at 475–76 & n. 40, 97 S.Ct. at 2806–07 & n. 40. In contrast, the alleged economic impact of the AWCA upon the manufacturers fails to meet any of the three tests for "punishment" recognized in *Nixon.*

Likewise misplaced is the manufacturers' reliance on *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). The purpose of the congressional act at issue in *Lovett* was to prohibit three individuals from engaging in future government work "because of what Congress thought to be their political beliefs." *Id.* at 314, 66 S.Ct. at 1078. In this case, there is no indication that the California Legislature regulated weapons manufactured by Springfield Armory and Heckler and Koch because it "th[ought] them guilty of conduct which deserves punishment." *Id.* at 317, 66 S.Ct. at 1080.

We therefore hold that the AWCA is not a bill of attainder with respect to Springfield Armory and Heckler and Koch.

## IV

■ The plaintiffs also challenge the AWCA as a violation of the Second Amendment to the United States Constitution. They argue that the Fourteenth Amendment incorporates the Second such that it limits the actions of states in addition to those of Congress, and that the right to bear arms exists to protect the individual as well as to assist in the common defense through the use of a well-regulated militia.[7]

The Supreme Court, however, has held that the Second Amendment constrains only the actions of Congress, not the states. *See United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876) ("The second amendment declares that [the right to bear arms] shall not be infringed; but this ... means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the national government...."); *Presser v. Illinois*, 116 U.S. 252, 264–65, 6 S.Ct. 580, 583–84, 29 L.Ed. 615 (1886) (same). We are therefore foreclosed from considering these arguments.

While the plaintiffs acknowledge that *Cruikshank* and *Presser* hold that the Second Amendment restrains only the actions of the federal government, they contend that these cases should not dictate the result in this case. Because neither *Cruik-*

---

7. *See* David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment*, 101 Yale L.J. 551, 558–59 (1991) (footnotes omitted):

Faced with [a] dearth of judicial instruction, commentators fall into only two groups—often called the individual rights and states' rights positions. The latter position relies on the language of the clause explaining the Amendment's purpose: *"A well regulated Militia, being necessary to the security of a free State,* the right of the people to keep and bear Arms shall not be infringed." According to this view, the goal of the provision is thus merely to guarantee the right of the states to maintain their militias, not to guarantee any right to individuals, and Congress has adequately protected the right of the states with the National Guard System.

In contrast, the individual rights' view emphasizes that the Amendment grants a right to "the people" not to the "states." Moreover, the unorganized militia in the 1790's included every male of arms-bearing age—and still does [through 10 U.S.C. § 311(a) ]. The Framers emphasized the importance of the unorganized militia in the constant struggle to forestall tyranny; one could not rely on the organized or "select" militia, as that body itself could become corrupt. As a last step, advocates of the individual rights view typically assert that the Amendment enshrined a right to own guns not only for revolution but also for defense of the home and perhaps for hunting and target practice as well.

*shank* nor *Presser* discusses the Fourteenth Amendment, they argue, the question of whether the Second Amendment is incorporated was never squarely addressed in either case and neither is precedential on this issue.[8]

In this vein, the plaintiffs urge that *Miller v. Texas*, 153 U.S. 535, 14 S.Ct. 874, 38 L.Ed. 812 (1894), limits the scope of *Cruikshank* and *Presser*. In *Miller*, the Court refused to consider whether "the Fourteenth Amendment limited the power of the States as to [Second Amendment] rights" because the claim had not been raised in the trial court. *Id.* at 538, 14 S.Ct. at 875. The plaintiffs read this declination as indicating that the Court itself has recognized that the incorporation of the Second Amendment is an open question.

We disagree. *Miller* predates the first Supreme Court decision incorporating a provision of the Bill of Rights through the Fourteenth Amendment. Therefore, there is no reason to believe that *Miller* left open the incorporation question any more than *Cruikshank* or *Presser*. Furthermore, the *Miller* Court cited *Cruikshank* in reaffirming "that the restrictions of [the Second Amendment] operate only upon the Federal power." 153 U.S. at 538, 14 S.Ct. at 875.

The plaintiffs also look to subsequent developments in pressing their argument that the Second Amendment is applicable against the state of California. Citing *Duncan v. Louisiana*, 391 U.S. 145, 162, 88 S.Ct. 1444, 1454, 20 L.Ed.2d 491 (1968) (Black, J., concurring), they argue that the Fourteenth Amendment automatically incorporates every provision of the Bill of Rights. This "theory of total incorporation," however, has been "continually rejected" by the Court. John E. Nowak & Ronald D. Rotunda, *Constitutional Law* 332 (4th ed. 1991). The Supreme Court has never held that the entire Bill of Rights is incorporated. *See id.* at 332–34 (citing the Second Amendment guarantee of the right to bear arms, the Fifth Amendment guarantee of a grand jury indictment, and the Seventh Amendment guarantee of a jury trial in a civil case as provisions explicitly held inapplicable against the states).

Next, the plaintiffs urge that the Court's recent opinion in *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265–66, 110 S.Ct. 1056, 1060–61, 108 L.Ed.2d 222 (1990), indicating that the phrase "the people" is to be given a uniform construction wherever it appears in the Bill of Rights, requires us to consider whether the Second Amendment—which provides that "the right of the people to keep and bear Arms, shall not be infringed"—protects individual rights against interference by the state. Even if *Verdugo–Urquidez* can be read to support the proposition that each of the amendments which speaks of a right of "the people" guarantees an individual right, the question remains *against whom* these rights may be asserted. Nothing in *Verdugo–Urquidez* upsets the Court's holding in *Cruikshank* and *Presser* that Second Amendment rights, whatever their scope, can be asserted only against the federal government. Therefore, it is for the Supreme Court, not us, to revisit the reach of the Second Amendment.

Nor are we influenced to change this view by remarks of various legislators during passage of the Freedmen's Bureau Act of 1866, the Civil Rights Act of 1866, and the Civil Rights Act of 1871. The plaintiffs argue that these remarks show that the framers of the Fourteenth Amendment intended that the Second Amendment guarantee an individual right of persons to acquire and keep rifles, pistols, and shotguns. While they provide an interesting insight that the plaintiffs assert is newly discovered, the point is the same: *Cruikshank*, which was decided only five years after the adoption of the 1871 Act, and *Presser* both make clear that the Second Amendment binds only the national government.

In this view we join the Seventh Circuit, which considered arguments similar to

---

**8.** *Cf.* Sanford Levinson, *The Embarrassing Second Amendment,* 99 Yale L.J. 637, 653 (1989) ("The first 'incorporation decision,' *Chicago, B. & Q.R. Co. v. Chicago*[, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897)], was not delivered until eleven years after *Presser;* one therefore cannot know if the judges in *Cruikshank* and *Presser* were willing to concede that *any* of the amendments comprising the Bill of Rights were anything more than limitations on congressional or other national power.") (footnote omitted).

those plaintiffs make in this case, and held that *Cruikshank* and *Presser* are still controlling. *See Quilici v. Village of Morton Grove*, 695 F.2d 261, 269–70 (7th Cir.1982) (upholding local ordinance prohibiting possession of handguns in village; *Presser* is still "good law," especially in light of Supreme Court's rejection of theory "that the entire Bill of Rights applies to the states through the fourteenth amendment"), *cert. denied*, 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983). Until such time as *Cruikshank* and *Presser* are overturned, the Second Amendment limits only federal action, and we affirm the district court's decision "that the Second Amendment stays the hand of the National Government only." *Fresno Rifle*, 746 F.Supp. at 1419.[9]

AFFIRMED.

---

**9.** The parties also disagree whether strict scrutiny or rational basis review should be applied in deciding whether the AWCA is in harmony with the Second Amendment. Because we do not pass on the constitutionality of the AWCA with respect to the Second Amendment, it is unnecessary to determine the appropriate standard of judicial review.