**Russell Allen NORDYKE; Ann Sallie Nordyke, dba TS Trade Shows; Jess B. Guy; Duane Darr; William J. Jones; Daryl David; Tasiana Wertyschyn;**

---

Jean Lee; Todd Baltes; Dennis Blair; R.A. Adams; Roger Baker; Mike Fournier; Virgil McVicker, Plaintiffs–Appellants,

v.

Mary V. KING; Gail Steele; Wilma Chan; Keith Carson; Scott Haggerty, County of Alameda; The County of Alameda Board of Supervisors, Defendants–Appellees.

No. 99–17551.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 10, 2000.

Submission Vacated, Certified to California Supreme Court Sept. 12, 2000.

Certified Question Decided by California Supreme Court June 26, 2002.

Supplemental Briefing Ordered Sept. 6, 2002.

Resubmitted Feb. 11, 2003.

Filed Feb. 18, 2003.

Donald E.J. Kilmer, Jr., Law Offices of Donald Kilmer, San Jose, CA, argued the cause and filed briefs for the appellants.

Sayre Weaver, Richards, Watson, & Gershon, San Francisco, CA, argued the cause for the appellees; Richard Winnie, County Counsel, County of Alameda, was on the briefs.

C.D. Michel, Trutanich Michel, LLP, San Pedro, CA, and Stephen P. Halbrook, Law Offices of Stephen P. Halbrook, Fairfax, VA, were on the brief for amicus curiae National Rifle Association of America, Inc.

Before: ALARCÓN, O'SCANNLAIN and GOULD, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Concurrence by Judge GOULD.

O'SCANNLAIN, Circuit Judge.

We must decide whether a local ordinance prohibiting the possession of firearms on county property infringes upon constitutional rights protected by the First and Second Amendments.

I

Russell Nordyke and Sallie Nordyke (dba TS Trade Shows) ("Nordyke") have been promoting gun shows at the Alameda County Fairgrounds ("Fairgrounds") since 1991. The Fairgrounds are located on un-

incorporated county land in the City of Pleasanton. The exhibitors at the show include sellers of antique (pre–1898) firearms, modern firearms, ammunition, Old West memorabilia, and outdoor clothing. In addition, the show hosts educational workshops, issue groups, and political organizations.

In August 1999, Alameda County ("County") passed an ordinance making illegal the possession of firearms on County property ("Ordinance"). In pertinent part, the Ordinance reads: "Every person who brings onto or possesses on county property a firearm, loaded or unloaded, or ammunition for a firearm is guilty of a misdemeanor." Alameda County, Cal., Ordinance § 9.12.120(b). The Ordinance would forbid the presence of firearms at gun shows, such as Nordyke's, held at the Fairgrounds. As a practical matter, the Ordinance makes it unlikely that a gun show could profitably be held there.

Seeking to prevent the Ordinance's enforcement, Nordyke brought suit against the County in the United States District Court for the Northern District of California. Nordyke applied for a temporary restraining order, claiming that the Ordinance was preempted by state gun regulations and that it violated the First Amendment's free speech guarantee. The district court judge treated the application as one for a preliminary injunction and denied it. The judge noted that under either test for a preliminary injunction, a litigant must at least show a fair chance of success on the merits and ruled that Nordyke had failed to do so. Because he concluded that Nordyke had little chance of success on the merits, he did not reach the balance of the hardships determination. Nordyke then filed this timely interlocutory appeal.

We certified Nordyke's preemption claim to the California Supreme Court asking the following question: "Does state law regulating the possession of firearms and gun shows preempt a municipal ordinance prohibiting gun possession on county property"? *Nordyke v. King* ("*Nordyke I* "), 229 F.3d 1266, 1267 (9th Cir.2000).

The California Supreme Court granted certification and ultimately held, "whether or not the Ordinance is partially preempted, Alameda County has the authority to prohibit the operation of gun shows held on its property, and, at least to that extent, may ban possession of guns on its property." *Nordyke v. King* ("*Nordyke II* "), 27 Cal.4th 875, 118 Cal.Rptr.2d 761, 44 P.3d 133, 138 (2002). Pursuant to Rule 29.5 of the California Rules of Court we follow the answer provided by the California Supreme Court to the certified question. We therefore conclude that the district court properly determined that Nordyke's preemption claim was without merit.

Nevertheless, we must still decide Nordyke's remaining constitutional claims. Nordyke urges, under the First Amendment, that the Ordinance impermissibly infringes upon constitutionally protected speech rights.

Nordyke also makes a Second Amendment challenge to the Ordinance. Pending the certification of Nordyke's preemption claim to the California Supreme Court, there were several judicial developments relating to the Second Amendment. As a result, Nordyke filed a motion for supplemental briefing with this court which we granted. Because of our sister circuit's holding in *United States v. Emerson*, 270 F.3d 203 (5th Cir.2001), and the change in the United States government's position on the scope of the Second Amendment,[1]

---

**1.** *See* Opposition to Petition for Certiorari in *United States v. Emerson*, No. 01–8780, at 19 n. 3, *available at* http://www.usdoj.gov /osg/briefs/2001/0responses/2001–8780.-resp.pdf.

Nordyke now urges on appeal that the Ordinance unduly infringes the right of individuals under the Second Amendment to possess privately and to bear their own firearms.

## II

We consider first Nordyke's challenge to the Ordinance on the grounds that it infringes his First Amendment right to free speech. The district court squarely rejected Nordyke's argument that gun possession is expressive conduct protected by the First Amendment and that the ban on the possession of firearms unconstitutionally interferes with commercial speech.[2]

### A

As to Nordyke's expressive conduct claim, the Supreme Court has "rejected the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (citation and internal quotation marks omitted). However, the Court has "acknowledged that conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* (citation and internal quotation marks omitted).

■ In the case at hand, Nordyke argues that possession of guns is, or more accurately, can be speech. In evaluating his claim, we must ask whether "[a]n intent to convey a particularized message [is] present, and [whether] the likelihood [is] great that the message would be understood by those who viewed it." *Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). If the possession of firearms is expressive conduct, the question becomes whether the County's "regulation is related to the suppression of free expression." *Johnson,* 491 U.S. at 403, 109 S.Ct. 2533. If so, strict scrutiny applies. If not, we must apply the less stringent standard announced in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

■ The first step of this inquiry— whether the action is protected expressive conduct—is best suited to an as applied challenge to the Ordinance. However, in this case, Nordyke challenged the law before it went into effect. Accordingly, he mounts a facial challenge, relying on hypotheticals and examples to illustrate his contention that gun possession can be speech.

■ In evaluating Nordyke's claim, we conclude that a gun itself is not speech. The question in *Johnson* was whether flag burning was speech, not whether a flag was speech. 491 U.S. at 404–06, 109 S.Ct. 2533. Here too, the correct question is whether gun possession is speech, not whether a gun is speech. Someone has to do something with the symbol before it can be speech. Until the symbol is brought onto County property, the Ordinance is not implicated. *See also Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (analyzing whether the wearing of armbands is speech, not whether armbands themselves are speech); *O'Brien,* 391 U.S. at 376, 88 S.Ct. 1673 (analyzing whether burning of draft cards is speech).

---

2. In addition, the district court considered whether the Ordinance was a constitutional time, place, and manner regulation. Nordyke does not press this argument on appeal, however.

In the context of a facial challenge, Nordyke's contentions are unpersuasive. Gun possession can be speech where there is "an intent to convey a particularized message, and the likelihood [is] great that the message would be understood by those who viewed it." *Spence,* 418 U.S. at 410–11, 94 S.Ct. 2727. As the district court noted, a gun protestor burning a gun may be engaged in expressive conduct. So might a gun supporter waving a gun at an anti-gun control rally. Flag waving and flag burning are both protected expressive conduct. *See Johnson,* 491 U.S. at 404–06, 109 S.Ct. 2533. Typically a person possessing a gun has no intent to convey a particular message, nor is any particular message likely to be understood by those who view it. The law itself applies broadly to ban the possession of all guns for whatever reason on County property. The law includes exceptions, primarily for those otherwise allowed to carry guns under state law, but these exceptions do not narrow the law so that it "has the inevitable effect of singling out those engaged in expressive activity." *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 706–07, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986).

As Nordyke's "facial freedom of speech attack" does not involve a statute "directed narrowly and specifically at expression or conduct commonly associated with expression," his challenge fails. *See Roulette v. City of Seattle,* 97 F.3d 300, 305 (9th Cir. 1996) (quoting *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 760, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)). In *Roulette,* we turned back a facial First Amendment challenge to a city ordinance prohibiting sitting or lying on the sidewalk. The plaintiffs argued that the law infringed their free speech rights because sitting and lying can sometimes communicate a message. *See id.* at 303. We "reject[ed] plaintiffs' facial attack on the ordinance" because this conduct is not "integral to, or commonly associated with, expression." *Id.* at 305. Likewise, Nordyke's challenge fails because possession of a gun is not "commonly associated with expression."

Nordyke points out that several of the rifles for sale are decorated with political messages, most prominently the National Rifle Association Tribute Rifle, which depicts the NRA banner, a militia member and an inscription quoting the Second Amendment: "The Right of the People to Keep and Bear Arms." Where the symbols on the gun (not the gun itself) convey a political message, the gun likely represents a form of political speech itself. *See Gaudiya Vaishnava Soc'y v. City and County of San Francisco,* 952 F.2d 1059, 1063 (9th Cir.1991) (holding that merchandise displaying political messages are entitled to First Amendment protection). Here, Nordyke is mounting a facial challenge. In this context, the presence of a handful of NRA Tribute Rifles at a show at which the vast majority of the prohibited guns bear no message whatsoever does not impugn the facial constitutionality of the Ordinance. *See Roulette,* 97 F.3d at 305; *cf. Gaudiya,* 952 F.2d at 1064–65 (upholding First Amendment challenge where case involved only merchandise bearing political messages). Thus, we agree with the district court's conclusion that the Ordinance does not unconstitutionally infringe expressive conduct.[3]

**B**

Next, Nordyke contends that the Ordinance's prohibition of gun possession

---

**3.** However, we note that our holding does not foreclose a future as applied challenge to the Ordinance.

on County property unconstitutionally burdens his right to commercial speech. We have previously held that the act of exchanging money for a gun is not "speech" for the purposes of the First Amendment. *See Nordyke v. Santa Clara County* (*"Nordyke III"*), 110 F.3d 707, 710 (9th Cir.1997). In *Nordyke III*, the very same Nordykes that are before us in this case successfully challenged an addendum to a lease between the county and the fairgrounds operator that barred gun shows from the fairgrounds. The lease addendum held to be an unconstitutional infringement of commercial free speech rights in *Nordyke III* prohibited offers to sell guns. In contrast, the Ordinance here bars neither sales nor offers to sell, only possession. *See* Alameda County, Cal., Ordinance § 9.12.120(b). Nevertheless, Nordyke argues that the prohibition on possession makes the sale more difficult and sometimes impossible, stifling commercial speech.

Pursuant to *Nordyke III*, the sale itself is not commercial speech. It is difficult to argue then that making the sale (non speech) more difficult by barring possession (non-speech) infringes speech. Nordyke cites no authority for this proposition. Nor is this the case of making a sale more difficult by barring speech. In cases such as *Nordyke III*, what renders the law unconstitutional is the interference with speech itself, not the hindering of actions (e.g., sales) that are not speech. As possession itself is not commercial speech and a ban on possession at most interferes with sales that are not commercial speech, we agree with the district court's conclusion that the County's prohibition on possession does not infringe Nordyke's right to free commercial speech.

### III

Finally, we turn to Nordyke's challenge to the Ordinance on Second Amendment grounds. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. The meaning of this amendment and the extent of the constitutional right it confers have been the subject of much scholarly and legal debate.

The "individual rights" view advocated by Nordyke has enjoyed recent widespread academic endorsement. *See, e.g.,* Sanford Levinson, *The Embarrassing Second Amendment,* 99 Yale L.J. 637 (1989); Eugene Volokh, *The Commonplace Second Amendment,* 73 N.Y.U. L.Rev. 793 (1998). In addition, Nordyke finds support for the individual rights interpretation from our sister circuit's recent holding in *United States v. Emerson,* 270 F.3d 203 (5th Cir. 2001), that the Second Amendment "protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms." *Id.* at 260.

We recognize that our sister circuit engaged in a very thoughtful and extensive review of both the text and historical record surrounding the enactment of the Second Amendment. And if we were writing on a blank slate, we may be inclined to follow the approach of the Fifth Circuit in *Emerson.* However, we have squarely held that the Second Amendment guarantees a *collective* right for the states to maintain an armed militia and offers no protection for the individual's right to bear arms. In *Hickman v. Block,* 81 F.3d 98, 102 (9th Cir.1996), we held that "it is clear that the Second Amendment guarantees a collective rather than an individual right. Because the Second Amendment guarantees the right of the states to maintain armed militia, the states alone stand in the position to show legal injury when this

right is infringed." (citations and internal quotation marks omitted).

As a result, our holding in *Hickman* forecloses Nordyke's Second Amendment argument. We specifically held there that individuals lack standing to raise a Second Amendment challenge to a law regulating firearms. *Id.* at 103. Because "Article III standing is a jurisdictional prerequisite," *id.* at 101, we have no jurisdiction to hear Nordyke's Second Amendment challenge to the Ordinance. *See Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").[4]

IV

For the foregoing reasons, the district court's denial of Nordyke's application for a preliminary injunction must be

AFFIRMED.

GOULD, Circuit Judge, Specially Concurring:

I join the court's opinion, and write to elaborate that *Hickman v. Block*, 81 F.3d 98 (9th Cir.1996), was wrongly decided, that the remarks in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.2002), about the "collective rights" theory of the Second Amendment are not persuasive, and that we would be better advised to embrace an "individual rights" view of the Second Amendment, as was adopted by the Fifth Circuit in *United States v. Emerson*, 270 F.3d 203, 260 (5th Cir.2001), consistent with *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939).[1] We

---

**4.** We should note in passing that in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.2002), another panel took it upon itself to review the constitutional protections afforded by the Second Amendment even though that panel was also bound by our court's holding in *Hickman*. The panel in *Silveira* concluded that analysis of the text and historical record led it to the conclusion that the collective view of the Second Amendment is correct and that individual plaintiffs lack standing to sue.

However, we feel that the *Silveira* panel's exposition of the conflicting interpretations of the Second Amendment was both unpersuasive and, even more importantly, unnecessary. We agree with the concurring opinion in *Silveira*: "[W]e are bound by the *Hickman* decision, and resolution of the Second Amendment issue before the court today is simple: plaintiffs lack standing to sue for Second Amendment violations because the Second Amendment guarantees a collective, not an individual, right." *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir.2002) (Magill, J., concurring). This represents the essential holding of *Hickman* and is the binding law of this circuit.

There was simply no need for the *Silveira* panel's broad digression. In a recent case, an individual plaintiff cited to the Fifth Circuit's holding in *Emerson* and argued that the Second Amendment protects an individual right

to bear arms. *United States v. Hinostroza*, 297 F.3d 924, 927 (9th Cir.2002). However, we summarily, and properly as a matter of stare decisis, rejected the Second Amendment challenge on the grounds that it is foreclosed by this court's holding in *Hickman*.

Therefore, despite the burgeoning legal scholarship supporting the "individual rights" theory as well as the Fifth Circuit's holding in *Emerson*, the *Silveira* panel's decision to re-examine the scope and purpose of the Second Amendment was improper. Because "only the court sitting en banc may overrule a prior decision of the court," *Morton v. De Oliveira*, 984 F.2d 289, 292 (9th Cir.1993), the *Silveira* panel was bound by *Hickman*, and its rather lengthy re-consideration of *Hickman* was neither warranted nor constitutes the binding law of this circuit. Accordingly, we ignore the *Silveira* panel's unnecessary historical disquisition as the dicta that it is and consider ourselves bound only by the framework set forth in *Hickman*.

**1.** This view is the current view of the United States. *See* Opposition to Petition for Certiorari in *United States v. Emerson*, No. 01–8780, at 19 n. 3, *available* at http://www.usdoj.gov/osg/briefs/2001/0responses/2001–8780.resp.pdf ("The current position of the United States ... is that the Second Amendment more broadly protects the rights of in-

should recognize that individual citizens have a right to keep and bear arms, subject to reasonable restriction by the government.[2] We should also revisit whether the requirements of the Second Amendment are incorporated into the Due Process Clause[3] of the Fourteenth Amend-

dividuals, including persons who are not members of any militia or engaged in active military service or training, to possess and bear their own firearms, subject to reasonable restrictions ....").

**2.** *Emerson*, 270 F.3d at 260. *See also* Memorandum from the Attorney General [John Ashcroft] to all United States Attorneys, Re: *United States v. Emerson*, Nov. 9, 2001. ("The [*Emerson* ] opinion also makes the important point that the existence of this individual right does not mean that reasonable restrictions cannot be imposed to prevent unfit persons from possessing firearms or to restrict possession of firearms particularly suited to criminal misuse.").

**3.** Whether and to what extent the Bill of Rights should be incorporated into the Due Process Clause of the Fourteenth Amendment is a question that has intrigued many. *See* Felix Frankfurter, *Memorandum on "Incorporation" of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment*, 78 Harv. L.Rev. 746 (1965); Hugo Lafayette Black, A Constitutional Faith, at xvi-vii, 34–42 (1968); William J. Brennan Jr., *The Bill of Rights and the States*, 36 N.Y.U. L.Rev. 761 (1961); William J. Brennan Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U. L.Rev. 535 (1986); *Duncan v. Louisiana*, 391 U.S. 145, 171–193, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Harlan, J., dissenting); Erwin N. Griswold, *Due Process Problems Today in the United States, in* The Fourteenth Amendment 161, 164 (Bernard Schwartz ed., 1970); Akhil Reed Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 Yale L.J. 1193 (1992).

The *Silveira* majority states that *United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1876), and *Presser v. Illinois*, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), cases holding that the Second Amendment is not applicable to the states, "were decided before the Supreme Court held that the Bill of Rights is incorporated by the Fourteenth Amendment's Due Process Clause." *Silveira*, 312 F.3d at 1066 n. 17. These remarks of *Silveira* on incorporation are overbroad and inaccurate. Many Amendments of the Bill of Rights have been incorporated against the states.

*See, e.g., Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (right to criminal jury); *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (privilege against compelled self-incrimination); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (freedom of speech and press); *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (nonestablishment of religion); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (exclusion of evidence obtained by unreasonable search and seizure). However, the entire Bill of Rights has not been incorporated into the Fourteenth Amendment's Due Process Clause. *See* John E. Nowak & Ronald D. Rotunda, *Constitutional Law* 332–334 (4th ed.1991).

We have held that the Second Amendment is not incorporated and does not apply to the states. *Fresno Rifle and Pistol Club, Inc. v. Van De Kamp*, 965 F.2d 723 (9th Cir.1992). If *Fresno* controls, then the Second Amendment cannot be considered to apply to state and local regulation. *Fresno* in turn is grounded on *Cruikshank* and *Presser*. *Silveira* urges that *Cruikshank* and *Presser* have been undermined, asserting that *Barron v. Baltimore*, 32 U.S. 243, 7 Pet. 243, 8 L.Ed. 672 (1833) (holding that the Bill of Rights does not apply to the states), on which *Cruikshank* and *Presser* relied, is ."now-rejected." *Silveira*, 312 F.3d at 1066 n. 17.

Although the Supreme Court has incorporated many clauses of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment, the Supreme Court has never explicitly overruled *Barron*. More importantly, the Supreme Court has never explicitly overruled *Cruikshank* and *Presser*. If reconsideration of *Fresno* is nonetheless permissible, we must ask whether the liberty guaranteed by the Second Amendment is protected by the Due Process Clause of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment protects those liberties which are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S.

ment.[4]

Our panel is bound by *Hickman,* and we cannot reach the merits of Nordyke's challenge to Second Amendment. But the holding of *Hickman* can be discarded by our court en banc or can be rejected by the Supreme Court if it decides to visit the issue of what substantive rights are safeguarded by the Second Amendment.[5]

I write to express disagreement with the "collective rights view" advanced in *Hickman* and *Silveira* because I conclude that an "individual rights view" of the Second Amendment is most consistent with the Second Amendment's language, structure, and purposes, as well as colonial experience and pre-adoption history.[6]

\*   \*   \*   \*   \*   \*

702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotation marks and citations omitted). To the extent that the Second Amendment was aimed at maintaining an armed citizenry and local power as a check against the possibility of federal tyranny, that purpose is not directly applicable to the states, and a Second Amendment restraint on the states in this sense is not implicit to the concept of ordered liberty. No single state could foreclose liberty of its citizens when faced with the collective power of the federal government and other states. On the other hand, as *Presser* recognized, the vitality of the Second Amendment's protection for national defense and for preservation of freedom depends on the premise that the states cannot disarm the citizenry. *Presser,* 116 U.S. at 264–266, 6 S.Ct. 580 ("It is undoubtedly true that all citizens capable of bearing arms constitute the reserved military force or reserve militia of the United States as well as of the states, and, in view of this prerogative of the general government, as well as of its general powers, the states cannot, even laying the constitutional provision in question out of view, prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.") In this respect, maintenance of an armed citizenry might be argued to be implicit in the concept of ordered liberty and protected by the Due Process Clause of the Fourteenth Amendment.

4. Another potential avenue for incorporation is via the Privileges and Immunities Clause of the Fourteenth Amendment which also may convey restrictions of the Second Amendment on the states. *See* Akhil Reed Amar, *The Second Amendment: A Case Study in Constitutional Interpretation* 2001 Utah. L.Rev. 889, 898–899. *See also* Laurence H. Tribe, *Taking Text and Structure Seriously: Reflections on Free–Form Method in Constitutional Interpre-*

tation, 108 Harv. L.Rev. 1221, 1297 n. 247 (1995) (advocating use of the Privileges and Immunities Clause and calling for *Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872), to be overruled in order to accomplish this goal). I express no view on this theory.

5. The Supreme Court's Second Amendment cases have displayed limited analysis of the structure and meaning of the Second Amendment. *See generally* 1˙ Laurence H. Tribe, American Constitutional Law 894–902 (3d ed.2000). The Supreme Court in any appropriate case, however, may decide to review and clarify Second Amendment theory and application, and, as Justice Thomas has remarked, "determine whether Justice Story was correct when he wrote that the right to bear arms 'has justly been considered, as the palladium of the liberties of a republic.'" *Printz v. United States,* 521 U.S. 898, 938–939, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (Thomas, J., concurring) (quoting 3 Joseph Story, Commentaries § 1890, p. 746 (1833)).

6. In addition to the Fifth Circuit, *see Emerson,* 270 F.3d at 264, many scholars have reached this conclusion. *See, e.g.,* Don B. Kates, Jr. *Handgun Prohibition and the Original Meaning of the Second Amendment,* 82 Mich. L.Rev. 204, 211–43 (1983) (advocating the individual rights view); Sanford Levinson, *The Embarrassing Second Amendment,* 99 Yale L.J. 637, 642 (1989) (same); Robert E. Shalhope, *The Ideological Origins of the Second Amendment,* 69 J. Am. Hist. 599 (1982) (same); William Van Alstyne, *The Second Amendment and the Personal Right to Arms,* 43 Duke L.J. 1236, 1253 (1994) (same); *but see* Michael C. Dorf, *What Does the Second Amendment Mean Today,* 76 Chi.-Kent L.Rev. 291, 294 (2000) (advocating a collective rights view); Jack N. Rakove, *The Second Amendment: The Highest Stage of Originalism,* 76 Chi–Kent L.Rev. 103,

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Because the "collective rights" view of *Hickman* and *Silveira* relies on the Second Amendment's introductory clause, it denigrates the right "of the people" and seeks to limit that right to participation in militia activity. The first eight Amendments of the Bill of Rights protect personal rights of the people. The introductory clause of the Second Amendment provides one justification, not the sole one, for the personal right that is granted. The introductory clause cannot properly be read to eliminate the substantive protection of "the right of the people." Limiting the Second Amendment's protection to collective rights of militias affronts the most basic protections of the Second Amendment. The subject of the Second Amendment is the right of the people to keep and bear arms; the text of the Second Amendment protects that right from infringement.

Also, the "collective rights" view of the *Silveira* majority gives too little weight to the Second Amendment's protection of a right to "keep" arms. The *Silveira* majority seeks to enhance collective rights theory by contending that to "bear" arms has a military meaning. *Silveira,* 312 F.3d at 1072. But the Second Amendment's literal terms are conjunctive. The *Silveira* majority urges that "keep and bear" should be read together. *Id.* at 1074. Though the terms are related, the distinct right to "keep" arms is individual and a helpful antecedent to bearing arms in a militia.

The *Silveira* majority also urges that the word "keep" has no independent content because the Second Amendment does not protect a right to "own" or a right to "possess" arms. *Id.* at 1072 ("We consider it highly significant, however, that the second clause does not purport to protect the right to 'possess' or 'own', but rather to 'keep and bear' arms."). This argument is not valid. First, ownership is irrelevant. One can keep arms that belong to a friend or relative, and a bailee of arms can protect a homestead or serve in a militia. Second, as for the argument that the Second Amendment doesn't say "possess" arms, consider the American Heritage dictionary's first definition of "keep": "to retain possession of." The American Heritage Dictionary 459 (3d ed.1974); *see also* Thomas Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) (defining "to keep" as "[t]o retain; to have in custody"); Samuel Johnson, A Dictionary of the English Language (7th ed. 1785) (defining "to keep" as "to retain; not to lose" and also "[t]o have in custody."). Because literally a right to "keep" arms means a right to possess arms, *Silveira's* argument, to the extent that it rests on a distinction between "keep" and "possess," is not persuasive. Third, *Silveira's* argument that a right to "keep" arms is subordinate to a right to "bear" arms sidesteps the literal conjunctive language of the Amendment and misconstrues the nature of a militia in which ordinary citizens contribute their personal arms to, and risk their lives for, the Nation's defense.

The conclusion that the Second Amendment's language supports an individual right to "keep and bear arms" is strengthened when we consider the nature and meaning of the term "Militia." The Second Amendment's language indicates that the "Militia" rests upon the shoulders of the people. As Professor Akhil Amar has

124 (2000) (same); David Yassky, *The Second Amendment: Structure, History and Constitutional Change,* 99 Mich. L.Rev. 588, 597 (2000) (arguing that "the Founders' over-riding concern was to ensure that the new nation's military force would be composed of state militias instead of, or at least in addition to, a federal standing army").

explained, "the militia were the people and the people were the militia." Akhil Reed Amar, *The Second Amendment: A Case Study in Constitutional Interpretation* 2001 Utah. L.Rev. 889, 892. He further explained that an earlier draft of the Amendment recited that the militia would be "composed of the body of the people." *Id.* (*citing* The Complete Bill of Rights 170–173) (Neil H. Cogan, ed., 1997).

Perhaps most importantly, the Second Amendment's purposes strongly support the theory of an individual right to "keep and bear" arms. The Second Amendment serves at least the following two key purposes: (1) to protect against external threats of invasion; and (2) to guard against the internal threat that our republic could degenerate to tyranny.[7] The purpose of militia to oppose external threat and preserve the national security is apparent from the face of the Second Amendment. The purpose of militia to check potential tyranny of a national government is implicit and is documented by contemporaneous parallel provisions of state constitutions.[8]

This view is also reinforced by English and colonial history. English history shows constant recourse to militia to withstand invading forces that arrived not rarely from England's neighboring lands. *See generally* 2 Winston S. Churchill, History of the English Speaking Peoples: The New World (Dodd, Mead, & Co.1966); 3 Winston S. Churchill, History of the English Speaking Peoples: The Age of Revolution (Dodd, Mead, & Co.1967). In the colonies, not only soldiers, but also farmers, merchants, and statesmen typically owned weapons, and there can be no doubt that militia played important roles in defending the colonies in the seventeenth and eighteenth centuries and during the revolutionary break with Great Britain.

Those who debated and framed the Bill of Rights were educated in practical political concepts and doubtless recognized that an opening gambit for tyrants is to disarm the public.[9] If the Second Amendment is held to protect only a state-regulated mili-

---

**7.** On the general problem of risks that a democratic republic may not endure, a classic work, first published in 1885 by nineteenth-century legal scholar Sir Henry Sumner Maine, is *Popular Government* (Liberty Classics 1976).

**8.** A few examples from state constitutions illustrate the point:

"[T]he people have a right to bear arms, for the defence of the State; and, as standing armies, in time of peace, are dangerous to liberty, they ought not be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power." N.C. Declaration of Rights, § XVII (1776)

"[T]he people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And ... the military should be kept under strict subordination, to, and governed by, the civil power." Penn. Const. Declaration of Rights, cl. XIII (1776)

"[T]he people have a right to bear arms for the defence of themselves and the State—and as standing armies in time of peace are dangerous to liberty, they ought not to be kept up; and ... the military should be kept under strict subordination to and governed by the civil power." Vt. Const. ch. I., art. 16 (1777)

"[A] well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free state; ... standing armies, in time of peace, should be avoided as dangerous to liberty; and ... in all cases the military should be under strict subordination to, and governed by, the civil power." Va. Const. art. I., § 13 (1776).

**9.** "One of the ordinary modes, by which tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offense to keep arms, and by substituting a regular army in the stead of a resort to the militia. The friends of a free government cannot be too watchful, to overcome the dangerous tendency of the public mind to sacrifice, for the sake of mere private

tia, then there would be no constitutional bar to a federal government outlawing possession of all arms by hunters and those with legitimate needs for protection. A general confiscation of guns could become the order of the day. I believe that result is foreclosed by the salient purpose of the Second Amendment to guard against tyranny, and that an individual right to keep and bear arms must be recognized.

It does not follow that such a right is absolute. The Bill of Rights, though robust, must be interpreted in light of societal needs. For example, even the broad protections of free speech in the First Amendment do not protect a person who "falsely shout[s] fire in a theatre and caus[es] a panic." *Schenck v. U.S.*, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (Holmes, J.). Similarly, the Fourth Amendment's general requirement of a warrant for a search permits exceptions for exigent circumstances. *See Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63

L.Ed.2d 639 (1980). And though recognizing an individual right to keep and bear arms, government can within due bounds regulate ownership or use of weapons for the public good. We would make progress if the Supreme Court were to establish a doctrine of an individual Second Amendment right subject to reasonable government regulation. The decisional chips would thereafter fall where they may on the basis of particular cases and the delicate balance of their precise facts, aided by the complementary efforts of lawyers, scholars and judges.[10] The law would best put aside extreme positions and adopt an assessment of reasonableness of gun regulation, for this would place us on the right track.[11]

Restricting the Second Amendment to "collective rights" of militias and ignoring individual rights of the people betray a key protection against the recurrent tyranny that may in each generation threaten individual liberty.[12] The *Silveira* majority

convenience, this powerful check upon the designs of ambitious men." Joseph Story, A Familiar Exposition of the Constitution of the United States § 450, p. 246 (1840).

10. The law develops through interdependent actions of academics advancing theories, advocates championing them in litigation, and Judges making decisions that clarify doctrine. The process is ongoing, for after decisions, academics will critique and offer suggested improvements, advocates will bring cases arguing what Judges said as refined by academic feedback, and more refined decisions result from this process. *See* Hon. Wade H. McCree, Jr., *The Annual John Randolph Tucker Lecture, Partners in a Process: The Academy and the Courts*, 37 Wash. & Lee. L.Rev. 1041 (1981).

11. In my view it is an error, though understandable one, to view the Second Amendment exclusively or primarily with the issue in mind of whether it constrains gun control. That controversial issue, as important as it may be, can be a distorting lens through which to view the Amendment if it clouds judgment and prevents understanding of the

basic purposes of the Second Amendment. Instead, the Second Amendment should be considered in light of its core purposes of protecting the nation's safety from external threat or internal tyranny. However, recognition of individual right in the Second Amendment, to protect national security, is not inconsistent with reasonable regulation, which may be permissible under several theories: (1) all weapons are not "arms" within the meaning of the Second Amendment; (2) "arms" protected may be limited to those consistent with use by an organized military force, as suggested in *Miller;* and (3) important government interests may justify reasonable regulation.

12. We should instead heed the observations of President John F. Kennedy on the Second Amendment, which have remaining vitality:

"By calling attention to 'a well regulated militia,' the 'security' of the nation, and the right of each citizen 'to keep and bear arms,' our founding fathers recognized the essentially civilian nature of our economy. Although it is extremely unlikely that the fears of governmental tyranny which gave

takes the position that the Framers' concerns to check the possibility of a Federal government tyranny are sufficiently answered by reading the Second Amendment merely to ensure that the states could not be barred from funding state-organized militia. *Silveira,* 312 F.3d at 1085. I disagree. The Second Amendment cannot properly be interpreted to entrust the freedom of the people to the premise that state governments would arm a self-reliant people and protect the people against a federal tyranny. The practical concept of militia contemplates an armed citizenry capable of rising up, with what arms they hold or can find, to defeat, resist or at minimum delay an invader until more organized power can be marshalled. The likelihood of broad resistance from an armed citizenry is a deterrent to any would be invader. Equally important, the practical concept of militia, embracing an armed citizenry, stands to deter risk of government degradation to tyranny. This concept is weakened by *Silveira's* premise that the citizens could rely on their states to be an arsenal and repository for arms, and otherwise have no right.

The Second Amendment protects not the rights of militias but the rights "of the people." It protects their right not only to "bear arms," which may have a military connotation, but to "keep arms," which has an individual one. By giving inadequate weight to the individual right to keep arms, the *Silveira* majority does not do justice to the language of the Second Amendment and disregards the lesson of history that an armed citizenry can deter external aggression and can help avoid the internal danger that a representative government may degenerate to tyranny. The

right to "keep and bear arms" is a fundamental liberty upon which the safety of our Nation depends, and it requires for its efficacy that an individual right be recognized and honored.

I reach this conclusion despite a recognition that many may think that these ideas are outmoded, that there is no risk in modern times of our government becoming a tyranny, and that there is little threat that others would invade our shores or attack our heartland. However, the Second Amendment was designed by the Framers of our Constitution to safeguard our Nation not only in times of good government, such as we have enjoyed for generations, but also in the event, however unlikely, that our government or leaders would go bad. And it was designed to provide national security not only when our country is strong but also if it were to become weakened or otherwise subject to attack. As the people bear the risk of loss of their freedom and the pain of any attack, our Constitution provides that the people have a right to participate in defense of the Nation. The Second Amendment protects that fundamental right.

rise to the Second Amendment will ever be a major danger to our nation, the Amendment still remains an important declaration of our basic civilian-military relationships, in which every citizen must be ready to participate in the defense of his country. For that reason I believe the Second Amendment will always be important." John F. Kennedy, *Know Your Lawmakers,* Guns, April 1960, at 4.