# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RUSSELL ALLEN NORDYKE; ANN
SALLIE NORDYKE, dba TS Trade
Shows; JESS B. GUY; DUANE DARR;
WILLIAM J. JONES; DARYL N.
DAVID; TASIANA WESTYSCHYN; JEAN
LEE; TODD BALTES; DENNIS BLAIR,
R.L. ADAMS; ROGER BAKER; MIKE
FOURNIER; VIRGIL MCVICKER,
          *Plaintiffs-Appellants,*

        v.

MARY V. KING; GAIL STEELE;
WILMA CHAN; KEITH CARSON;
SCOTT HAGGERTY; COUNTY OF
ALAMEDA; COUNTY OF ALAMEDA
BOARD OF SUPERVISORS,
          *Defendants-Appellees.*

No. 07-15763

D.C. No.
CV-99-04389-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Argued and Submitted
January 15, 2009—San Francisco, California

Filed April 20, 2009

Before: Arthur L. Alarcón, Diarmuid F. O'Scannlain, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge O'Scannlain;
Concurrence by Judge Gould

4465

## COUNSEL

Donald E. Kilmer, Jr., Law Offices of Donald Kilmer, San Jose, California, argued the cause for the plaintiffs-appellants and filed the briefs. Don B. Kates, Esq., Battleground, Washington, was also on the supplemental briefs.

Richard E. Winnie, County Counsel, Alameda County, California, argued the cause for the defendants-appellees and was on the briefs. T. Peter Pierce, Richards, Watson & Gershon, Los Angeles, California, filed the brief; Sayre Weaver, Richards Watson & Gershon, Los Angeles, California, was also on the brief.

C.D. Michel, Trutanich-Michel, LLP, Long Beach, California, filed a brief on behalf of amici curiae the National Rifle Association of America, Inc., and the California Rifle & Pistol Association. Stephen P. Halbrook, Law Offices of Stephen P. Halbrook, Fairfax, Virginia, was also on the brief.

Tracy Duell-Cazes, Law Offices of Tracy Duell-Cazes, San Jose, California, filed a brief on behalf of amici curiae Professors of Law.

Vanessa A. Zecher, Law Offices of Vanessa A. Zecher, San Jose, California, filed a brief on behalf of amici curiae Professors of Law, History, Political Science, or Philosophy.

Alan Gura, Gura & Possessky, PLLC, Alexandria, Virginia, filed a brief on behalf of amicus curiae Second Amendment Foundation, Inc.

Jordan Eth, Morrison & Foerster LLP, San Francisco, California, filed a brief on behalf of Amici Curiae the Legal Community Against Violence, City of Oakland, City and County of San Francisco, Brady Center to Prevent Gun Violence, California Peace Officers' Association, California Police Chiefs Association, California State Sherrifs' Association, Coalition to Stop Gun Violence, Violence Policy Center, and Youth Alive!. Jacqueline Bos and Angela E. Kleine, Morrison & Foerster LLP, San Francisco, California, were also on the brief.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Second Amendment prohibits a local government from regulating gun possession on its property.

### I

### A

Russell and Sallie Nordyke operate a business that promotes gun shows throughout California. A typical gun show involves the display and sale of thousands of firearms, generally ranging from pistols to rifles. Since 1991, they have publicized numerous shows across the state, including at the

public fairgrounds in Alameda County. Before the County passed the law at issue in this appeal, the Alameda gun shows routinely drew about 4,000 people. The parties agree that nothing violent or illegal happened at those events.

In the summer of 1999, the County Board of Supervisors, a legislative body, passed Ordinance No. 0-2000-22 ("the Ordinance"), codified at Alameda County General Ordinance Code ("Alameda Code") section 9.12.120. The Ordinance makes it a misdemeanor to bring onto or to possess a firearm or ammunition on County property. Alameda Code § 9.12.120(b). It does not mention gun shows.

According to the County, the Board passed the Ordinance in response to a shooting that occurred the previous summer at the fairgrounds during the annual County Fair.[1] The Ordinance begins with findings that "gunshot fatalities are of epidemic proportions in Alameda County." *Id.* § 9.12.120(a). At a press conference, the author of the Ordinance, Supervisor Mary King, cited a "rash of gun-related violence" in the same year as the fairground shooting. She was referring to a series of school shootings that attracted national attention in the late 1990s, the most notorious of which occurred at Columbine High School in Littleton, Colorado.[2]

But the Nordykes insist that something more sinister was afoot. They point to some of King's other statements as evidence that she actually intended to drive the gun shows out of Alameda County. Shortly before proposing the Ordinance, King sent a memorandum to the County Counsel asking him to research "the most appropriate way" she might "prohibit

---

[1] Police ultimately apprehended the shooter, who had nothing to do with the Nordykes or their gun shows.

[2] *See, e.g.*, Pew Research Center for the People & the Press, Columbine Shooting Biggest News Draw of 1999, http://people-press.org/report/48/columbine-shooting-biggest-news-draw-of-1999 (last visited April 4, 2009).

the gun shows" on County property. King declared she had "been trying to get rid of gun shows on Country property" for "about three years," but she had "gotten the run around from spineless people hiding behind the constitution, and been attacked by aggressive gun toting mobs on right wing talk radio." At her press conference, King also said that the County should not "provide a place for people to display guns for worship as deities for the collectors who treat them as icons of patriotism." Without expressing any opinion about King's remarks, the Board of Supervisors adopted the Ordinance.

County officials then exchanged several letters with the Nordykes. The General Manager of the fairgrounds asked the Nordykes to submit a written plan to explain how their next gun show would comply with the Ordinance. As the County Counsel had told the General Manager, the Ordinance did not expressly prohibit gun shows or the sale of firearms. The Nordykes insisted then and maintain now that they cannot hold a gun show without guns; perhaps because they thought it futile, they never submitted a plan.

During the same period, representatives of the Scottish Caledonian Games ("the Scottish Games") inquired about the effect of the new law on the activities they traditionally held on the fairgrounds. Those activities include reenactments, using period firearms loaded with blank ammunition, of historic battles. After the inquiries, the County amended the Ordinance to add several exceptions. Importantly, the Ordinance no longer applies to

> [t]he possession of a firearm by an authorized participant in a motion picture, television, video, dance, or theatrical production or event, when the participant lawfully uses the firearm as part of that production or event, provided that when such firearm is not in the actual possession of the authorized participant, it is secured to prevent unauthorized use.

Alameda Code § 9.12.120(f)(4). This exception allows members of the Scottish Games to reenact historic battles if they secure their weapons, but it is unclear whether the County created the exception just for them.

By the time the County had written this exception into the Ordinance, the Nordykes and several patrons of and exhibitors at the gun shows (collectively, "the Nordykes") had already sued the County and its Supervisors under 42 U.S.C. § 1983 for various constitutional violations. The amendment did not mollify them, and their lawsuit has wended through various procedural twists and turns for nearly a decade.

B

Two rulings of the district court are now before us, the tangled history of which we summarize.

1

Initially, the Nordykes argued that the Ordinance violated their First Amendment right to free speech and was preempted by state law. They sought a temporary restraining order, which the district court treated as an application for a preliminary injunction. *Nordyke v. King*, (*Nordyke III*), 319 F.3d 1185, 1188 (9th Cir. 2003). After the district court denied the injunction, we accepted the case for an interlocutory appeal. Rather than reach the merits of the case, we certified to the California Supreme Court the question whether state laws regulating gun shows and the possession of firearms preempted the Ordinance. *See Nordyke v. King* (*Nordyke I*), 229 F.3d 1266 (9th Cir. 2000). The California Supreme Court answered that the Ordinance was not preempted. *See Nordyke v. King* (*Nordyke II*), 44 P.3d 133, 138 (Cal. 2002).

We proceeded to address the Nordykes' challenges under the First and Second Amendments.[3] Construing the First

---

[3]Due to developments in the law while the certified question was pending in the California Supreme Court, the Nordykes filed and we granted

Amendment challenge as a facial one, we rejected their argument that the statute burdened the expressive conduct of gun possession. *Nordyke III*, 319 F.3d at 1190. Our opinion noted that its rejection of the facial attack did not "foreclose a future as applied challenge to the Ordinance." *Id.* at 1190 n.3.

We also concluded that our prior opinion in *Hickman v. Block*, 81 F.3d 98 (9th Cir. 1996), precluded the Nordykes' Second Amendment claim. *Nordyke III*, 319 F.3d at 1191. *Hickman* had held "that individuals lack standing to raise a Second Amendment challenge to a law regulating firearms" because the right to keep and bear arms was a collective one. *Id.* at 1191-92. We remanded the case for further proceedings.

2

On remand, the Nordykes moved for leave to file a Second Amended Complaint. They wished to rephrase their First Amendment challenge, arguing that, as applied to their use of the fairgrounds, the Ordinance violated their freedom of expression by making gun shows impossible. In addition, the Second Amended Complaint contained as-applied versions of other constitutional challenges, including an equal protection claim. The district court allowed the Nordykes to add all of those claims, but denied the motion to add a Second Amendment cause of action. The district court explained that because *Nordyke III*'s holding on the collective nature of the right to keep and bear arms precluded the claim, there was no sense in relitigating it.

After two motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), only the expressive conduct claim under the First Amendment and the equal protection claim survived. The County moved for summary judgment on those remain-

---

a motion to file supplemental briefing on a Second Amendment claim. *Nordyke III*, 319 F.3d at 1188.

ing claims, which the district court granted. The Nordykes timely appealed.

3

In their opening brief on appeal, the Nordykes explicitly noted a pending petition for certiorari in the Supreme Court in the case of *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), and explained that, should the Court grant the petition, they would request a stay and file supplemental briefs. The Court, of course, did grant the petition for certiorari. Though we initially denied the request for a stay, the decision in *Heller* came down shortly thereafter, which prompted us to allow the parties to file supplemental briefs. Thus, the Nordykes appeal not only the district court's grant of the County's motion for summary judgment, but also the district court's denial of their motion for leave to amend their complaint to add a cause of action pursuant to the Second Amendment.

II

**[1]** We begin with the Nordykes' attempt to revive their Second Amendment claim. The district court rested its denial of leave to amend the complaint on our precedent that an individual lacks standing to bring a Second Amendment challenge because the right it protects is a collective, not an individual one. *See Hickman*, 81 F.3d at 102-03; *see also Nordyke III*, 319 F.3d at 1191. The Nordykes now argue that the Supreme Court's decision in *Heller* abrogates our case law and compels the district court to grant their motion for leave to amend their complaint.

**[2]** To reach this argument on the merits, we must first decide whether *Heller* abrogated *Hickman*. It did. *Hickman* rested on our conclusion that the Second Amendment protects only a collective right; *Heller* squarely overruled such conclusion. *See Heller*, 128 S. Ct. at 2799 ("There seems to us no

doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."). Thus the basis for *Hickman*'s holding has evaporated, and the opinion is clearly irreconcilable with *Heller*. In such circumstances, we consider our prior decision abrogated by higher authority.[4] *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc).

**[3]** The second obstacle facing the Nordykes is incorporation. That is, we must decide whether the Second Amendment applies to the states through the Fourteenth, a question that *Heller* explicitly left open. *See* 128 S. Ct. at 2813 n.23. Finally, even if the Fourteenth Amendment does incorporate the Second against the states, we must determine whether it actually invalidates the Ordinance.

## A

There are three doctrinal ways the Second Amendment might apply to the states: (1) direct application, (2) incorporation by the Privileges or Immunities Clause of the Fourteenth Amendment, or (3) incorporation by the Due Process Clause of the same Amendment.

### 1

**[4]** Supreme Court precedent forecloses the first option. The Bill of Rights directly applies only to the federal government. *Barron v. Mayor of Balt.*, 32 U.S. (7 Pet.) 243, 247-51 (1833). "Although the Supreme Court has incorporated many clauses of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment, the Supreme Court has never explicitly overruled *Barron*." *Nordyke III*, 319 F.3d at 1193 n.3 (Gould, J., specially concurring). Therefore*,* the Second Amendment does not directly apply to the states. *See United*

---

[4]Indeed, the County does not dispute this point in its supplemental briefing.

*States v. Cruikshank*, 92 U.S. 542, 553 (1875) (citing *Barron* as a basis for the conclusion that "[t]he second amendment . . . means no more than that [the right to keep and bear arms] shall not be infringed by Congress"); *see also Presser v. Illinois*, 116 U.S. 252, 265 (1886) (concluding that the Second Amendment "is a limitation only upon the power of Congress and the National government, and not upon that of the State").

2

**[5]** We are similarly barred from considering incorporation through the Privileges or Immunities Clause. The Clause provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. Under the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873), this language protects only those rights that derive from United States citizenship, but not those general civil rights independent of the Republic's existence, *see id.* at 74-75.[5] The former

---

[5]We are aware that judges and academics have criticized *Slaughter-House*'s reading of the Privileges or Immunities Clause. *See, e.g.*, *Saenz v. Roe*, 526 U.S. 489, 527-28 (1999) (Thomas, J., dissenting) ("Because I believe that the demise of the Privileges or Immunities Clause has contributed in no small part to the current disarray of [the Supreme Court's] Fourteenth Amendment jurisprudence, I would be open to reevaluating its meaning in an appropriate case."); *id.* at 522 n.1 (collecting academic sources); Michael Anthony Lawrence, *Second Amendment Incorporation Through the Fourteenth Amendment Privileges or Immunities and Due Process Clauses*, 72 Mo. L. Rev. 1, 12-35 (2007); *see also* Akhil Reed Amar, *The Bill of Rights* 163-230 (1998) (arguing that the Privileges or Immunities Clause applies against the states all "personal privileges" of individual citizens, whether enumerated in the Bill of Rights or not, but not the rights of the states or the general public). Nevertheless, *Slaughter-House* remains good law. We note, however, that the substantive due process doctrine, which we discuss *infra* pp. 4481-83, appears to arrive at a result similar to that urged by the dissenters from the Supreme Court's opinion in *Slaughter-House*. *Compare Washington v. Glucksberg*, 521 U.S. 702, 719-721 (1997) ("[T]he Due Process Clause [of the Fourteenth Amendment] specially protects those fundamental rights and liberties

include only rights the Federal Constitution grants or the national government enables, but not those preexisting rights the Bill of Rights merely protects from federal invasion. *Id.* at 76-80. The Second Amendment protects a right that predates the Constitution; therefore, the Constitution did not grant it. *See, e.g.*, *Heller*, 128 S. Ct. at 2797 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right."). It necessarily follows that the Privileges or Immunities Clause did not protect the right to keep and bear arms because it was not a right of citizens of the United States. *See Cruikshank*, 92 U.S. at 553; *cf. Presser*, 116 U.S. at 266-67 (holding that the "right to associate with others as a military company" is not a privilege of citizens of the United States).

3

**[6]** The final avenue for incorporation is that by which other provisions of the Bill of Rights have come to bind the states: selective incorporation through the Due Process Clause of the Fourteenth Amendment. *See, e.g.*, *Duncan v. Louisiana*, 391 U.S. 145 (1968) (right to criminal jury); *Malloy v. Hogan*, 378 U.S. 1 (1964) (privilege against compelled self-incrimination); *Gideon v. Wainwright*, 372 U.S. 335 (1963) (right to counsel); *Mapp v. Ohio*, 367 U.S. 643 (1961) (exclusion of evidence obtained by unreasonable search and seizure); *Cantwell v. Connecticut*, 310 U.S. 296 (1940) (Establishment Clause).

a

The initial hurdle to selective incorporation is our decision in *Fresno Rifle & Pistol Club, Inc. v. Van de Kamp*, 965 F.2d

_____

which are, objectively, deeply rooted in this Nation's history and tradition . . . ." (internal quotation marks and citation omitted)), *with Slaughter-House*, 83 U.S. at 122 (Bradley, J., dissenting) ("In my judgment, it was the intention of the people of this country in adopting that amendment to provide National security against violation by the States of the fundamental rights of the citizen.").

723 (9th Cir. 1992). There, we concluded that the Second Amendment applies only to the federal government. *Id.* at 729-31. The Nordykes argue that, although we precluded direct application of the Second Amendment and incorporation through the Privileges or Immunities Clause, we did not address selective incorporation through the Due Process Clause. We agree.

*Fresno Rifle* does not specify which Clause of the Fourteenth Amendment—the Privileges or Immunities Clause or the Due Process Clause—we rejected as the instrument of incorporation. Certainly, plaintiffs "argue[d] that the Fourteenth Amendment incorporates the Second such that it limits the actions of states in addition to those of Congress," and we rejected such argument. *Id.* at 729 "Until such time as *Cruikshank* and *Presser* are overturned," we stated, "the Second Amendment limits only federal action, and we affirm the district court's decision 'that the Second Amendment stays the hand of the National Government only.' " *Id.* at 731 (citation omitted). The County argues that this reliance on *Cruikshank* and *Presser* precludes any incorporation.

But close examination of our opinion in *Fresno Rifle* defeats such argument. First, we noted that *Cruikshank* and *Presser* held that "the Second Amendment constrains only the actions of Congress, not the states," a proposition that merely follows from *Barron*. *Id.* at 729. Moving from direct application of the Bill of Rights to incorporation, we then concluded that *Cruikshank* and *Presser* foreclosed the argument of the plaintiffs that the Fourteenth Amendment incorporated the Second. *Id.*[6] As discussed above, *Cruikshank* and *Presser* involved direct application and incorporation through the Privileges or Immunities Clause, but not incorporation through the Due Process Clause. This suggests we referred to

---

[6]We also rejected the argument that *Miller v. Texas*, 153 U.S. 535 (1894), limits the holdings of *Cruikshank* and *Presser*. *See Fresno Rifle*, 965 F.2d at 730.

those cases as shorthand to reject the first two theories, but not the third—selective incorporation through the Due Process Clause.

The litigation history of *Fresno Rifle* bolsters this impression. The plaintiffs rested their incorporation argument primarily on historical evidence that the Privileges or Immunities Clause incorporated the right to keep and bear arms. Brief of Appellant at 39-43, *Fresno Rifle*, 965 F.2d 723 (No. 91-15466). Though they referred to *Duncan*, a case involving selective incorporation, they did so in support of a brief, quixotic argument that the Fourteenth Amendment "automatically incorporates every provision of the Bill of Rights." *Fresno Rifle*, 965 F.2d at 730. For this proposition they cited not the majority opinion, but Justice Black's concurrence in *Duncan*, in which he reiterated his long-held view that the Bill of Rights applied in its entirety to the states. Brief of Appellant at 35, *Fresno Rifle*, 965 F.2d 723 (No-91-15466) (citing *Duncan*, 391 U.S. at 162 (Black, J., concurring)); *Fresno Rifle*, 965 F.2d at 730 (citing *Duncan*, 391 U.S. at 162 (Black, J., concurring); *see also Duncan*, 391 U.S. at 166 (Black, J., concurring (arguing that the Privileges or Immunities Clause "express[es] the idea that henceforth the Bill of Rights shall apply to the States").[7] In rejecting this attempt to revive Justice Black's view, which never commanded a majority of the

---

[7]Justice Black's complete view was that "the Fourteenth Amendment, as a whole, makes the Bill of Rights applicable to the States. This would certainly include the language of the Privileges [or] Immunities Clause, as well as the Due Process Clause." *Duncan*, 391 U.S. at 166 n.1; *see also Adamson v. California*, 332 U.S. 46, 74-75 (1947) (Black, J., dissenting). But the discussion in *Duncan* that the plaintiffs in *Fresno Rifle* cited concerned only the Privileges or Immunities Clause, the same Clause their briefs focused on. *Fresno Rifle* probably rejected Justice Black's more holistic theory too, but it still left untouched the theory of selective incorporation through the Due Process Clause. *Cf. Twining v. New Jersey*, 211 U.S. 78, 99 (1908) (noting that, even if a right is not incorporated by Privileges or Immunities Clause, what we would now call selective incorporation by the Due Process Clause "requires separate consideration"), *overruled on other grounds by Malloy*, 378 U.S. at 6.

Supreme Court, we simply noted that "[t]his theory of total incorporation . . . has been continually rejected." *Fresno Rifle*, 965 F.2d at 730 (internal quotation marks omitted).

[7] Thus, we did not, in *Fresno Rifle*, reach the question of whether the Second Amendment is selectively incorporated through the Due Process Clause. Perhaps because neither party raised the predicate arguments, we certainly "did not engage in the sort of Fourteenth Amendment inquiry required by [the Supreme Court's] later cases." *Heller*, 128 S. Ct. at 2813 n.23.[8] It is upon that Fourteenth Amendment inquiry which we now embark.

b

[8] The Fourteenth Amendment bars "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Under the doctrine known as substantive due process, this Clause "guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). In this conception, due process encompasses certain "fundamental" rights. *Reno v. Flores*, 507 U.S. 292, 301-302 (1993). Selective incorporation is a species of substantive due process, in which the rights the Due Process Clause protects include some of the substantive rights enumerated in the first eight amendments to the Constitution. *See Twining*, 211 U.S. at 99 ("[I]t is possible that some of the personal rights safeguarded by the first eight Amendments against National action may also be safeguarded against state action, because a denial of

---

[8]Other circuits have similarly relied on *Presser* to reject arguments for direct application or total incorporation, without addressing selective incorporation. *See, e.g.*, *Maloney v. Cuomo*, 554 F.3d 56, 58-59 (2d Cir. 2009) (per curiam) (rejecting direct application); *Quilici v. Vill. of Morton Grove*, 695 F.2d 261, 269-70 (7th Cir. 1982) (rejecting direct application and total incorporation).

them would be a denial of due process of law."); *see also Glucksberg*, 521 U.S. at 720 (speaking of enumerated rights together with implied fundamental rights in the context of substantive due process). Both selective incorporation and substantive due process require us to pose the same question: is a right so fundamental that the Due Process Clause guarantees it? Substantive due process addresses unenumerated rights; selective incorporation, by contrast, addresses enumerated rights.

Under the familiar early formulation of *Palko v. Connecticut*, only those rights "implicit in the concept of ordered liberty" were incorporated. 302 U.S. 319, 325 (1937), *overruled by Benton v. Maryland*, 395 U.S. 784 (1969). The analysis thus excluded those rights "not of the very essence of a scheme of ordered liberty," including only those without which "a fair and enlightened system of justice would be impossible." *Id. Palko*, in other words, invited an exercise in speculative political philosophy, guided by "a study and appreciation of the meaning, the essential implications, of liberty itself." *Id.* at 326.

The Supreme Court ultimately abandoned this abstract enterprise in favor of a more concretely historical one. In *Duncan*, the Court recognized that it had jettisoned the metaphysical musings of *Palko* for an analysis grounded in the "actual systems bearing virtually every characteristic of the common-law system that has been developing contemporaneously in England and in this country." 391 U.S. at 149 n.14. Therefore, incorporation turns on "whether given this kind of system a particular procedure is fundamental—whether, that is, a procedure is necessary to an Anglo-American regime of ordered liberty." *Id.* In determining whether the Due Process Clause incorporated the right to jury trials in criminal cases, *Duncan* noted that every American state "uses the jury extensively, and imposes very serious punishments only after a trial at which the defendant has a right to a jury's verdict." *Id.* The Court also reviewed the place of the right in pre-Founding

English law and in the Founding era itself. *See id.* at 151-54 (citing the English Declaration and Bill of Rights, Blackstone's Commentaries, early state constitutions, and other evidence from the Founding era).

We are persuaded that the same inquiry, though slightly rephrased, also applies to individual rights unconnected to criminal or trial procedures. Just as *Duncan* defined "fundamental rights" as those "necessary to an Anglo-American regime of ordered liberty," so the Supreme Court has determined, outside the context of incorporation, that only those institutions and rights "deeply rooted in this Nation's history and tradition" can be fundamental rights protected by substantive due process. *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion); *id.* at 503 n.10 (noting the similarity between this general substantive due process inquiry and the incorporation test stated in *Duncan*); *see also Glucksberg*, 521 U.S. at 721 ("Our Nation's history, legal traditions, and practices . . . provide the crucial guideposts for responsible decisionmaking [in the area of substantive due process]" (internal quotation marks and citation omitted)). The latter line of cases informs our analysis here, because incorporation is logically a part of substantive due process. Indeed, the non-incorporation cases amount to a model for straightforward application of *Duncan* outside the context of criminal procedure.[9]

---

[9]To be sure, individual rights unconnected to criminal procedure have been incorporated before. *See, e.g.*, *Schneider v. New Jersey*, 308 U.S. 147, 160 (1939) (noting that the "freedom of speech and of the press" is incorporated). However, in general, the Court either employed the *Palko*-style test, *see, e.g.*, *Wolf v. Colorado*, 338 U.S. 25, 26-27 (1949) (incorporating the right against unreasonable searches and seizures), *overruled on other grounds by Mapp*, 367 U.S. at 654-55, which it abandoned in *Duncan*, or it simply stated that the right in question was incorporated without substantive analysis, *see, e.g.*, *Schneider*, 308 U.S. at 160 n.8 (citing as its lead case *Gitlow v. New York*, 268 U.S. 652, 666 (1925), which assumed without deciding that the Due Process Clause incorporated the freedom of speech and of the press); *see also Louisiana ex rel. Francis v. Resweber*,

**[9]** To summarize, our task is to determine whether the right to keep and bear arms ranks as fundamental, meaning "necessary to an *Anglo-American* regime of ordered liberty." *Duncan*, 391 U.S. at 149 n.14 (emphasis added). If it does, then the Fourteenth Amendment incorporates it. This culturally specific inquiry compels us to determine whether the right is "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 721 (internal quotation marks and citation omitted). Guided by both *Duncan* and *Glucksberg*, we must canvass the attitudes and historical practices of the Founding era and the post-Civil War period, for those times produced the constitutional provisions before us.

c

**[10]** The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The prefatory clause of this Amendment describes the right it protects. The Supreme Court has explained that the phrase necessary to the "security of a free State," means necessary to the "security of a free polity."[10] *See Heller*, 128 S. Ct. at 2800 (internal quotation marks

329 U.S. 459, 463 (1947) (plurality opinion) (incorporating the right against cruel and unusual punishments). The only other mode of analysis in the case law is the historical approach the Court explicitly sanctioned in *Duncan. See, e.g.*, *Chi., Burlington & Quincy R.R. Co. v. Chicago*, 166 U.S. 226, 235-41 (1897) (incorporating the right to just compensation for property taken for public use on the basis of principles of the common law as revealed in cases on the right to property, in Thomas Cooley's seminal treatise on constitutional limitations, and in Justice Joseph Story's *Commentaries on the Constitution of the United States*).

[10]Some have argued that the text of the prefatory clause suggests precisely the opposite: that the right to keep and bear arms was only important for protecting the states from federal encroachment. *See Parker v. Dist. of Columbia*, 478 F.3d 370, 406 (D.C. Cir. 2007) (Henderson, J., dissenting) ("The Amendment was drafted in response to the perceived threat

omitted). Thus the text of the Second Amendment already suggests that the right it protects relates to an institution, the militia, which is "necessary to an Anglo-American regime of ordered liberty." *Duncan*, 391 U.S. at 149 n.14. The parallel is striking, particularly because the militia historically comprised all able-bodied male citizens. *Heller*, 128 S. Ct. at 2799.

This necessary "right of the people" existed before the Second Amendment as "one of the fundamental rights of Englishmen." *Id.* at 2797-98. *Heller* identified several reasons why the militia was considered "necessary to the security of a free state." First, "it is useful in repelling invasions and suppressing insurrections. Second, it renders large standing armies unnecessary . . . . Third, when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Id.* at 2800-01. In addition to these civic purposes, *Heller* characterized the right to keep and bear arms as a corollary to the individual right of self-defense. *Id.* at 2817 ("[T]he inherent right of self-defense has been central to the Second Amendment right."). Thus the right contains both a political component—it is a means to protect the public from tyranny—and a personal component—it is a means to protect the individual from threats to life or limb. *Cf.* Amar, *supra*, at 46-59, 257-66.

---

to the 'free[dom]' of the 'State[s]' posed by a national standing army controlled by the federal government." (alteration in original)); H. Richard Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 Chi.-Kent L. Rev. 403, 499 (2000) ("Most significantly, the Select Committee substituted 'State' for 'country' as the referent of the 'best security' clause, so that the proposed amendment now addressed more directly antifederal solicitude for state security."). This argument cannot survive the Supreme Court's admonition in *Heller* that "the phrase 'security of a free state' and close variations seem to have been terms of art in 18th-century political discourse, meaning a 'free country' or free polity." *Heller*, 128 S. Ct. at 2800 (citing Eugene Volokh, *"Necessary to the Security of a Free State,"* 83 Notre Dame L. Rev. 1, 5 (2007)).

We must trace this right, as thus described, through our history from the Founding until the enactment of the Fourteenth Amendment.

i

We begin with the Founding era. *Heller* reveals evidence similar to that on which *Duncan* relied to conclude that the Due Process Clause incorporated the right to a jury in criminal cases. *Heller* began with the 1689 English Declaration of Right (which became the English Bill of Rights), just as *Duncan* did. *Compare Heller*, 128 S. Ct. at 2798 (noting that the Declaration of Right included the right to bear arms), *with Duncan*, 391 U.S. at 151 (noting that the Declaration of Right included the right to a jury trial).[11] Thus the right to keep and bear arms shares ancestry with a right already deemed fundamental. *Cf. Resweber*, 329 U.S. at 463 (plurality opinion) (relying solely on the presence of a prohibition against cruel and unusual punishments in the English Bill of Rights for the conclusion that it is incorporated into the Due Process Clause).

The parallel continues. *Heller* noted the emphasis Blackstone placed on the right, just as *Duncan* had looked to Blackstone. *Compare Heller*, 128 S. Ct. at 2798 ("Blackstone . . . cited the arms provision of the [English] Bill of Rights as one of the fundamental rights of Englishmen." (citation omitted)), *with Duncan*, 391 U.S. at 151-52 (citing Blackstone). This is significant because Blackstone "constituted the preeminent authority on English law for the founding generation." *Alden v. Maine*, 527 U.S. 706, 715 (1999). His theoretical

---

[11]The County contends that, because the English Bill of Rights only secured the right to bear arms against the Crown, it is not a fundamental right worthy of incorporation. But the precise contours of the English Bill of Rights are beside the point. As a clear statement of the "undoubted rights and liberties" of Englishmen, Bill of Rights, 1689, 1 W. & M., c. 2, § 7 (Eng.), it is a precursor to our own Bill of Rights. Therein lies its significance.

treatment of the right to bear arms provides insight into how American colonists would have understood it.

Blackstone gave the right to bear arms pride of place in his scheme. He divided rights of persons into absolute and relative rights. *See* William Blackstone, 1 Commentaries *123-24. It is "the principal aim of society," according to Blackstone, "to protect individuals in the enjoyment of those absolute rights," *id.* at *124-25; England alone among nations had achieved that aim. Blackstone defined these absolute rights as "personal security, personal liberty, and private property." *Id.* at *141. The English Constitution could only secure the actual enjoyment of these rights, however, by means of certain "barriers" designed "to protect and maintain [them] inviolate." *Id.* The right to bear arms ranked among these "bulwarks of personal rights." *Id.* Blackstone considered the right "a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." *Id.* at *144; *see also Heller*, 128 S. Ct. 2798-99 ("[T]he right secured in 1689 as a result of the [abuses of the Stuart monarchy] was by the time of the founding understood to be an individual right protecting against both public and private violence."). For readers of Blackstone, therefore, the right to bear arms closely followed from the absolute rights to personal security, personal liberty, and personal property.[12] It was a right crucial to safeguarding all other rights.

The behavior and words of the colonists themselves also demonstrate the right's importance. As *Heller* pointed out, the American colonists of the 1760s and 1770s strongly objected

---

[12]Blackstone's view of the right to bear arms pervades the writings of the Revolutionary generation. *See, e.g.*, Samuel Adams, Letter to the Editors, Boston Gazette, Feb. 27, 1769, *reprinted in* 1 *The Founders' Constitution* 90 (Philip B. Kurland & Ralph Lerner eds., 1987). It also suffused public discourse at the time of the Fourteenth Amendment's enactment. *See* Amar, *supra*, at 261-64 (providing examples); *infra* pp. 4492-94.

to royal infringements on the right to keep and bear arms, just as they objected to the Crown's interference with jury trials, a fact which *Duncan* highlighted. *Compare Heller*, 128 S. Ct. at 2799 ("[T]he Crown began to disarm the inhabitants of the most rebellious areas[, which] provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms."), *with Duncan*, 391 U.S. at 152 ("Royal interference with the jury trial was deeply resented."). A year before the infamous Boston Massacre in 1770, one pamphleteer commented on the tensions between suspicious colonists and the British troops quartered in the city:

> Instances of the licentious and outrageous behavior of the *military conservators* of the peace still multiply upon us, some of which are of such a nature . . . as must serve fully to evince that a late vote of this town, calling upon the inhabitants to provide themselves with arms for their defense, was a measure as *prudent* as it was *legal*: such violences are always to be apprehended from military troops, when quartered in the body of a populous city . . . . It is a natural right which the people have reserved to themselves, confirmed by the [English] Bill of Rights, to keep arms for their own defence; and as Mr. Blackstone observes, it is to be made use of when the sanctions of society and law are found insufficient to restrain the violence of oppression.

*A Journal of the Times*, Mar. 17, 1769, New York Journal, Supp. 1, April 13, 1769, *quoted in* Stephen Halbrook, *A Right to Bear Arms* 7 (1989). Thus, the events of the age confirmed Blackstone's assessment of the nature of the right.

Revolutionary agitators and theoreticians further advocated this Blackstonian view of the right to keep and bear arms. Two years after the Boston Massacre, Samuel Adams wrote, in a report of one of the Committees of Correspondence, that

"[a]mong the Natural Rights of the Colonists are these[:] First, a right to Life; Secondly, to Liberty; thirdly, to Property; *together with the Right to support and defend them in the best manner they can—* Those are evident Branches of, rather than deductions from, the Duty of Self-Preservation, commonly called the first Law of Nature."

Samuel Adams, *The Rights of the Colonists* (1772), *reprinted in* 5 *The Founders' Constitution*, *supra*, at 394, 395 (emphasis added). Writing to an American unionist in 1775, Alexander Hamilton threatened armed resistance to British invasions of American rights. *See* Alexander Hamilton, *The Farmer Refuted* (1775) *reprinted in* 1 The Works of Alexander Hamilton 55, 163 (Henry Cabot Lodge ed., 1904) ("If [Great Britain] is determined to enslave us, it must be by force of arms; and to attempt this, I again assert, would be nothing less than *the grossest infatuation, madness itself.*"); *see also id.* at 62-64 (referring to Blackstone's conception of "absolute rights").[13]

Thus, if the suspension of trial by jury, taxation without representation, and other offenses constituted the most offensive instances of British tyranny, the ability to call up arms-bearing citizens was considered the essential means of colonial resistance. Indeed, the attempt by British soldiers to destroy a cache of American ammunition at Concord, Massachusetts, sparked the battles at Lexington and Concord, which began the Revolutionary War. For the colonists, the importance of the right to bear arms "was not merely speculative theory. It was the lived experience of the[ ] age." Amar,

---

[13]Such rhetoric went beyond what Blackstone himself, a believer in Parliamentary supremacy, was prepared to support. *See* 1 Blackstone, *supra*, *157. Colonial advocacy of the right to revolution by arms therefore bore a closer similarity to the theories of political philosophers like John Locke than it did to those of Blackstone. It nonetheless is significant for our purposes that the colonists considered the Blackstonian right to be intrinsic to their defense of all their rights by revolution, regardless of whether Blackstone himself might have supported the American position.

*supra*, at 47 (referring to Locke's conception of the right of revolution).

This lived experience informed the colonists when they set out to form a government. They considered, by the light of experience as well as of education, that preserving the right to bear arms was the appropriate way both to resist the evil of standing armies and to render the evil unnecessary. *See Heller*, 128 S. Ct. at 2800-01. Advocating for the new Constitution, Hamilton argued that "if circumstances should at any time oblige the government to form an army of any magnitude[,] that army can never be formidable to the liberties of the people while there is a large body of citizens . . . who stand ready to defend their own rights and those of their fellow-citizens." The Federalist No. 29, at 153 (Alexander Hamilton) (Clinton Rossiter ed., 1961). As it was to many of his fellow citizens, a citizenry possessed of arms and trained in their use "appear[ed] to [Hamilton] the only substitute that c[ould] be devised for a standing army, and the best possible security against it, if it should exist." *Id.*

**[11]** This brief survey of our history reveals a right indeed "deeply rooted in this Nation's history and tradition." Moreover, whereas the Supreme Court has previously incorporated rights the colonists fought for, we have here both a right they fought for and the right that allowed them to fight.

ii

Evidence from the post-Revolutionary years strengthens this impression. Supreme Court Justice James Wilson, one of the framers of the Pennsylvania Constitution and the Federal Constitution, referred, in one of his lectures on the common law (delivered serially from 1790 to 1791), to the right of self-defense as "the great natural law of selfpreservation, which . . . cannot be repealed, or superseded, or suspended by any human institution. . . . [It is] expressly recognized in the constitution of Pennsylvania." James Wilson, Lecture on the

Right of Individuals to Personal Safety, *in* 3 The Works of the Honorable James Wilson 77, 84 (Bird Wilson ed., Phila., Lorenzo Press 1804). St. George Tucker, editor of "the most important early American edition of Blackstone's Commentaries," *Heller*, 128 S. Ct. at 2799, extolled the right to bear arms as the "true palladium of liberty." St. George Tucker, *View of the Constitution of the United States*, *in* 1 *Blackstone's Commentaries* app. at 300 (St. George Tucker ed., Phila., William Birch Young & Abraham Small 1803). Emphasizing the right's importance, Tucker cautioned that "[w]herever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." *Id.* Justice Joseph Story, in his influential Commentaries on the Constitution, echoed that sentiment. 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (Boston, Hilliard, Gray & Col. 1833) ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers . . . .").

Furthermore, state constitutions confirm the importance of the right to keep and bear arms throughout our history. "Four States adopted analogues to the Federal Second Amendment in the period between independence and the ratification of the Bill of Rights[, and b]etween 1789 and 1820, nine states adopted [such] analogues." *Heller*, 128 S. Ct. at 2802-03. Thus, as of 1820, thirteen of the twenty-three states admitted to the Union had Second Amendment analogues. We must take account of this prevalence of state constitutional analogues to the Second Amendment, just as the Supreme Court noted the ubiquity of state constitutional provisions guaranteeing juries in criminal cases when it incorporated that right. *See Duncan*, 391 U.S. at 153-54. The statistics are not as

overwhelming as those before the Court in *Duncan*, but they are nonetheless compelling.[14]

These materials reflect a general consensus, in case law as well as commentary, on the importance of the right to keep and bear arms to American republicanism. *See, e.g.*, *Heller*, 128 S. Ct. 2805-09, 2805-09 (discussing materials). They show the continued vitality of the right that the Englishmen of the Glorious Revolution declared, Blackstone lauded, and the American colonists depended upon.

iii

Finally, we survey the period immediately following the Civil War. Although it has not been considered dispositive in Fourteenth Amendment cases, the understanding of the Framers of that Amendment logically influences whether a right is fundamental, in the sense of deeply rooted in our history and traditions and necessary to an Anglo-American conception of ordered liberty.

As *Heller* recognized, "[i]n the aftermath of the Civil War, there was an outpouring of discussion of the Second Amendment in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly freed slaves." 128 S. Ct. at 2809-10; *see also* Amar, *supra*, at 192 (noting that "slavery led to state repudiation of virtually every one of the . . . freedoms [in the Bill of Rights]"). One major concern in these debates was the disarming of newly freed blacks in Southern states by statute as well as by vigilantism. *See Heller*, 128 S. Ct. at 2810. Many former slave states passed laws to that effect. *See, e.g.*, Act of Nov. 29, 1865, 1865 Miss. Laws 165 ("[N]o freedman, free Negro or mulatto . . . shall keep or carry fire-arms of any kind, or any

---

[14]As of today, forty-four states protect the right to bear arms. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 205 (2006).

ammunition, dirk or bowie knife . . . ."). Brigadier General Charles H. Howard, in a letter provided to Congress, reported to the head of the Freedmen's Bureau that the "militia organizations in the opposite county of South Carolina (Edgefield) were engaged in disarming the negroes. . . . Now, at Augusta, . . . I have authentic information that these abuses continue. In southwestern Georgia, I learned that the militia had done the same, sometimes pretending to act under orders from United States authorities." Report of the Joint Committee on Reconstruction, H.R. Rep. No. 39-30, pt. 3, at 46 (1st Sess. 1866).

The Framers of the Fourteenth Amendment sought to end such oppressions. During the debates surrounding the Freedmen's Bureau Act, the Civil Rights Act, and the Fourteenth Amendment, Senator Pomeroy listed among the "indispensable" "safeguards of liberty" someone's "right to bear arms for the defense of himself and family and his homestead." Cong. Globe, 39th Cong., 1st Sess. 1182 (1866), *quoted in Heller*, 128 S. Ct. at 2811. Representative Bingham, a principal author of the Fourteenth Amendment, argued that it was necessary to overrule *Barron* and apply the Bill of Rights to the states. In his view, *Barron* was wrongly decided because the Bill of Rights "secur[ed] to all the citizens in every State all the privileges and immunities of citizens, and to all the people all the sacred rights of persons—those rights dear to freemen and formidable only to tyrants." *Id.* at 1090. Representative James Wilson, a supporter of the Fourteenth Amendment, described Blackstone's scheme of absolute rights as synonymous with civil rights, in a speech in favor of the Civil Rights Act of 1866 (a precursor to the Fourteenth Amendment). *Id.* at 1115-19. Similarly, Representative Roswell Hart listed "the right of the people to keep and bear arms," among other rights, as inherent in a "republican government." *Id.* at 1629. The reports and testimony contain similar evidence, confirming that the Framers of the Fourteenth Amendment considered the right to keep and bear arms a crucial safeguard against white oppression of the freedmen. Stephen P. Hallbrook, *Freedmen, the Fourteenth Amendment,*

*and the Right to Bear Arms, 1866-1876*, at 9-38 (1998); *see also* Amar, *supra*, at 261-66.

We also note that the target of the right to keep and bear arms shifted in the period leading up to the Civil War. While the generation of 1789 envisioned the right as a component of local resistance to centralized tyranny, whether British or federal, the generation of 1868 envisioned the right as safeguard to protect individuals from oppressive or indifferent local governments. *See* Amar, *supra*, at 257-66. But though the source of the threat may have migrated, the antidote remained the same: the individual right to keep and bear arms, a recourse for "when the sanctions of society and laws are found insufficient to restrain the violence of oppression." 1 Blackstone, *supra*, at *144.

iv

The County does little to refute this powerful evidence that the right to bear arms is deeply rooted in the history and tradition of the Republic, a right Americans considered fundamental at the Founding and thereafter. The County instead argues that the states, in the exercise of their police power, are the instrumentalities of the right of self-defense at the heart of the Second Amendment. This argument merely rephrases the collective rights argument the Supreme Court rejected in *Heller*. Indeed, one need only consider other constitutional rights to see the poverty of this contention. State police power also covers, for instance, some of the conduct the First Amendment protects, but that does not deny individuals the right to assert First Amendment rights against the states.[15]

---

[15]Another argument to which the County devotes considerable time is a rather idiosyncratic peroration on political philosophy. The County argues that the ideas of eighteenth-century social contractarianism—the general political philosophy of men like Blackstone and Locke—presumed that individuals sacrificed their perfect liberty in nature to fight to preserve themselves in order to secure the benefits of the social contract. Though perhaps true as a summary statement, this argument says nothing about the extent to which society limits the absolute or natural right of self-defense.

Once the County actually addresses modern incorporation doctrine, it relies on general assertions that run afoul of *Heller*. For example, the County declares that "the English common law tradition does not recognize an individual's right to possess a firearm as a fundamental right." *Heller* plainly contradicts that statement because it says that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects." 128 S. Ct. at 2798. The County also claims that *Heller* "nowhere concludes that an individual right to possess firearms for personal self-defense is a fundamental right." But that misses the point. If *Heller* had indeed held that the right to keep and bear arms was a fundamental right as we use the term in substantive due process doctrine, then the issue would be foreclosed. The point is that language throughout *Heller* suggests that the right is fundamental by characterizing it the same way other opinions described enumerated rights found to be incorporated.

Surely, we tread carefully, for "guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Glucksberg*, 521 U.S. at 720 (internal quotation marks and citation omitted). But we have before us a right both "careful[ly] descri[bed]," because listed in the Bill of Rights and associated with an understanding dating to the Founders, and, as the foregoing history reveals, "deeply rooted in this Nation's history and tradition." *Id.* at 721 (internal quotation marks and citation omitted). Thus, because the right to keep and bear arms can meet the criteria set by *Duncan* and *Glucksberg*, we have undertaken the further historical analysis necessary to confirm what in *Heller* was only a suggestion.[16]

---

[16]Because, as *Heller* itself points out, 128 S. Ct. at 2813 n.23, *Cruikshank* and *Presser* did not discuss selective incorporation through the Due Process Clause, there is no Supreme Court precedent directly on point that bars us from heeding *Heller*'s suggestions. *Cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls . . . ."). *But see Maloney*, 554 F.3d at 58-59 (concluding that *Presser* forecloses application of the Second Amendment to the states).

d

**[12]** We therefore conclude that the right to keep and bear arms is "deeply rooted in this Nation's history and tradition." Colonial revolutionaries, the Founders, and a host of commentators and lawmakers living during the first one hundred years of the Republic all insisted on the fundamental nature of the right. It has long been regarded as the "true palladium of liberty." Colonists relied on it to assert and to win their independence, and the victorious Union sought to prevent a recalcitrant South from abridging it less than a century later. The crucial role this deeply rooted right has played in our birth and history compels us to recognize that it is indeed fundamental, that it is necessary to the Anglo-American conception of ordered liberty that we have inherited.[17] We are therefore persuaded that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment and applies it against the states and local governments.[18]

B

Though we conclude that the Due Process Clause of the Fourteenth Amendment applies the protections of the Second Amendment to state and local governments, the question

---

[17]By speaking of the two parts of the incorporation inquiry separately—"deeply rooted in this Nation's history and tradition" and "necessary to an Anglo-American regime of ordered liberty"—we do not mean to imply a distinct two-pronged test. The incorporation cases and the substantive due process cases both treat these two phrases as aspects of a holistic inquiry.

[18]The County and its amici point out that, however universal its earlier support, the right to keep and bear arms has now become controversial. *See generally* Sanford Levinson, *The Embarrassing Second Amendment*, 99 Yale L.J. 637 (1989). But we do not measure the protection the Constitution affords a right by the values of our own times. If contemporary desuetude sufficed to read rights out of the Constitution, then there would be little benefit to a written statement of them. Some may disagree with the decision of the Founders to enshrine a given right in the Constitution. If so, then the people can amend the document. But such amendments are not for the courts to ordain.

remains whether such application invalidates the specific Ordinance the Nordykes challenge.

1

Again, we begin with *Heller*, which did not announce any standard of review, though it precluded rational basis review as an insufficient protection for a specifically enumerated right.[19] *See Heller*, 128 S. Ct. at 2817 n.27. Rather than insist on a standard of review at the outset, the *Heller* Court evaluated the regulation at issue against the kind of conduct the Second Amendment protected from infringement.

The Court began its analysis of the District of Columbia's law by noting what activity the law covered: "the law totally bans handgun possession *in the home*. It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, *rendering it inoperable*." *Id.* at 2817 (emphases added). Next, the Court connected the statute's operation to the conduct the Second Amendment protects: "the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Id.* It was thus the statute's burdens on effective self-defense that implicated the Second Amendment. More particularly, *Heller* noted that the "prohibition extends . . . to the home, where the need for defense of self, family, and property is most acute." *Id.* For the Court, this meant that, no matter the intensity of constitutional scrutiny, the District's law could not survive.

---

[19]Fundamental rights usually receive strict scrutiny as a matter of substantive due process doctrine. *See, e.g.*, *Glucksberg*, 521 U.S. at 721. But where the Due Process Clause incorporates one of the rights enumerated in the Bill of Rights, the standard of review becomes that appropriate to the specific right. For example, First Amendment rights, whether against the states or the federal government, trigger the same standards of review. We find no reason to treat the Second Amendment differently.

**[13]** *Heller* tells us that the Second Amendment's guarantee revolves around armed self-defense. If laws make such self-defense impossible in the most crucial place—the home —by rendering firearms useless, then they violate the Constitution.

2

**[14]** But the Ordinance before us is not of that ilk. It does not directly impede the efficacy of self-defense or limit self-defense in the home. Rather, it regulates gun possession in public places that are County property.

The Nordykes counter that the Ordinance indirectly burdens effective, armed self-defense because it makes it more difficult to purchase guns. They point to case law on the right to sexual privacy as an analog. In *Carey v. Population Services International*, 431 U.S. 678 (1977), for instance, the Supreme Court measured state regulations limiting access to contraceptives by the same yardstick as they would a total ban on contraceptives. *See id.* at 688. Just as the Court held that "[l]imiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives," *id.* at 689, so the Nordykes argue that limiting the availability of firearms burdens their right to keep and bear arms for the purpose of self-defense.[20]

But "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 873 (1992)

---

[20]The County responds that the Nordykes' objection to the Ordinance has nothing to do with self-defense and everything to do with profit. According to the County, the Second Amendment does not protect the right to sell guns profitably and efficiently on County property. This is beside the point. The emphasis *Heller* placed on effective armed self-defense requires an inquiry into whether the Ordinance renders such self-defense impossible as a practical matter.

(joint opinion of O'Connor, Kennedy & Souter, JJ.). Indeed, "[n]umerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care . . . for abortion," for instance. *Id.* at 874. Even though the Supreme Court has recognized a right to an abortion, it has approved some of those regulations.

The Court has also held that the government need not fund abortions, even though women have a substantive due process right to obtain them. *See Harris v. McRae*, 448 U.S. 297, 315-16 (1980). In *Harris*, the Court drew a crucial distinction between government interference with activity the Constitution protects and the government's decision not to encourage, to facilitate, or to partake in such activity. "Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions," *Harris* declared, "it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Id.* at 317-18.[21] If we apply these principles here, we conclude that although the Second Amendment, applied through the Due Process Clause, protects a right to keep and bear arms for individual self-defense, it does not contain an entitlement to bring guns onto government property.

The County also points to the famous passage in *Heller* in which the Court assured that

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or *laws forbidding the carrying of firearms in sensitive places*

---

[21]Similarly, the Supreme Court recently confirmed that governments have a great deal of leeway in managing their own property. For example, they can adopt certain messages as their own and decline to adopt others without infringing the Free Speech Clause of the First Amendment. *See Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1131 (2009).

such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 128 S. Ct. at 2816-17 (emphasis added). The County argues that its Ordinance merely forbids the carrying of firearms in sensitive places, which includes the Alameda County fairgrounds and other County property.

The Nordykes object that the County has provided no way to determine what constitutes a "sensitive place." But neither did *Heller*; Second Amendment law remains in its infancy. The Court listed schools and government buildings as examples, presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children). Along the same lines, we notice that government buildings and schools are important to government functioning.

The Nordykes argue that the Ordinance is overbroad because it covers more than such sensitive places. They list the areas covered: "open space venues, such as County-owned parks, recreational areas, historic sites, parking lots of public buildings . . . and the County fairgrounds." The only one of these that seems odd as a "sensitive place" is parking lots. The rest are gathering places where high numbers of people might congregate. That is presumably why they are called "open space venues." Indeed, the fairgrounds itself hosts numerous public and private events throughout the year, which a large number of people presumably attend; again, the Nordykes' gun shows routinely attracted about 4,000 people. Although *Heller* does not provide much guidance, the open, public spaces the County's Ordinance covers fit comfortably within the same category as schools and government buildings.

**[15]** To summarize: the Ordinance does not meaningfully impede the ability of individuals to defend themselves in their homes with usable firearms, the core of the right as *Heller* analyzed it. The Ordinance falls on the lawful side of the divi-

sion, familiar from other areas of substantive due process doctrine, between unconstitutional interference with individual rights and permissible government nonfacilitation of their exercise. Finally, prohibiting firearm possession on municipal property fits within the exception from the Second Amendment for "sensitive places" that *Heller* recognized. These considerations compel us to conclude that the Second Amendment does not invalidate the specific Ordinance before us. Therefore, the district court did not abuse its discretion in denying the Nordykes leave to amend their complaint to add a Second Amendment claim that would have been futile.

## III

The Nordykes also appeal from the district court's grant of summary judgment on their claim under the First Amendment.

We have already laid out the template for analyzing the First Amendment claim, albeit in the context of a facial challenge:

> In evaluating [the Nordykes'] claim, we must ask whether "[a]n intent to convey a particularized message [is] present, and [whether] the likelihood [is] great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410-11 (1974). If the possession of firearms is expressive conduct, the question becomes whether the County's "regulation is related to the suppression of free expression." *Texas v. Johnson*, 491 U.S. 397, 403 (1989). If so, strict scrutiny applies. If not, we must apply the less stringent standard announced in *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

*Nordyke III*, 319 F.3d at 1189 (alterations in original). Because the County "does not contest that gun possession in the context of a gun show may involve certain elements of

protected speech," we assume, without deciding, that the Nor-dykes' possession of guns amounts to speech under the *Spence* test.

### A

### 1

Next, the question is whether to apply strict scrutiny to the Ordinance under *Johnson* or "the less stringent standard" of *O'Brien*.

**[16]** The level of scrutiny depends on whether the Ordinance is "unrelated to the suppression of free expression," *Johnson*, 491 U.S. at 407 (internal quotation marks and citation omitted), which in turn hinges on the aim of the law. The government may not "proscribe particular conduct *because* it has expressive elements. . . . A law *directed* at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires." *Id.* at 406 (internal quotation marks and citation omitted). In other words, courts determine the aim of a law by evaluating "the governmental interest at stake." *Id.* at 406-07. If a law hits speech because it aimed at it, then a court must apply strict scrutiny; but if it hits speech without having aimed at it, then a court must apply the *O'Brien* intermediate scrutiny standard.

### 2

**[17]** The Nordykes argue that the County adopted the Ordinance in order to silence members of the so-called "gun culture" from expressing their political and social views about firearms and the Second Amendment. However, the language of the statute suggests that gun violence, not gun culture, motivated its passage. Section 9.12.120(a) recites several statistics about gunshot deaths and injuries in Alameda County and then concludes that "[p]rohibiting the possession of fire-

arms on County property will promote the public health and safety by contributing to the reduction of gunshot fatalities and injuries in the County." *Id.*

Nevertheless, the Nordykes point to alternative evidence of the statute's purpose: the comments of Supervisor King and the section 9.12.120(f)(4) exception for authorized firearm use at certain artistic events.

As we have quoted them above, *supra* pp. 4471-72, King's private and public remarks could be read to suggest that she harbored a motive to exclude people of a certain view from the fairgrounds. But the feelings of one County official do not necessarily bear any relation to the aims and interests of the County. Indeed, the Supreme Court has admonished litigants against attributing the motivations of legislators to legislatures:

> *What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.* We decline to void essentially on the ground that it is unwise legislation . . . which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.

*O'Brien*, 391 U.S. at 384 (emphasis added).

In *Johnson*, too, the Court determined whether the law at issue was related to the suppression of speech without psychoanalyzing its authors. The opinion never even mentioned legislative history or the stated motives of any legislator. Instead, it analyzed the statute in terms of the interests the State declared, not the personal likes or dislikes of the law's backers. Other First Amendment cases are of a piece. *See, e.g.*, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) ("The ordinance *by its terms* is designed to prevent

crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life, not to suppress the expression of unpopular views." (emphasis added) (internal quotation marks and alterations omitted)); *Boos v. Barry*, 485 U.S. 312, 320-21 (1988) (opinion of O'Connor, J.).

This approach is particularly appropriate here, because the County has offered a perfectly plausible purpose for the Ordinance: the reduction of gun violence on County property. The Ordinance itself proclaims that purpose; even Supervisor King expressed it during her press conference.

Undeterred, the Nordykes also argue that the statute's exception for certain artistic productions or events indicates its constitutionally suspect relation to the suppression of speech. They cry foul because the Ordinance effectively bans gun shows at the fairgrounds by regulating gun possession there so strictly, while it goes out of its way to accommodate the Scottish Games. But most statutes have exceptions; they only suggest unconstitutional favoritism if what they allow generates the same problems as what they permit. *See, e.g.*, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 510-12 (1981) (plurality opinion). The Scottish Games reenact old battles; the Nordykes sponsor heavily attended gun shows. It is not difficult to see how 4,000 shoppers trading in modern firearms pose more danger than a crowd of history buffs in traditional garb playing with blank ammunition. In any event, only if the Scottish Games ensure that "authorized participants" possess the firearms or that the firearms are secure can they get the benefit of the exception. If the Nordykes could meet one of those criteria, they could get the benefit of the exception as well.

[18] We reject the Nordykes' invitation to apply strict scrutiny because we conclude that the Ordinance is "unrelated to the suppression of free expression." *Johnson*, 491 U.S. at 407

(internal quotation marks and citation omitted). Instead, *O'Brien*'s heightened scrutiny standard applies.

## B

"[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376. More specifically, "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377.

The first prong has more relevance to the federal government, for it exercises only enumerated powers. The reverse, of course, is the case with state and local governments. Unless the Constitution specifically removes a power from the states, they have the authority to use it.[22] U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."); *see also Cruikshank*, 92 U.S. at 551 ("The government of the United States is one of delegated powers alone. Its authority is defined and limited by the Constitution. All powers not granted to it by that instrument are reserved to the States or the people."). We pass over the first prong because the Nordykes make no argument that municipalities lack the power to regulate firearms possession on their own property.

---

[22]A power of the State to do something, of course, is separate from the rights of individuals, which may preclude states from doing things they have the power to do.

**[19]** The second prong requires us to evaluate whether the Ordinance furthers the County's interest in promoting safety and discouraging violence. The Nordykes argue that, given their as-applied, as opposed to a facial, challenge, the Ordinance is unconstitutional because the County cannot show that any violence ever occurred at their gun shows. But courts analyze the constitutionality of statutes as applied to a litigant in the abstract, regardless of whether or not he has himself actually created the problem that motivates the law he challenges. *See, e.g.*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296-97 (1984) ("[T]he validity of this regulation need not be judged solely by reference to the demonstration at hand."); *One World One Family Now v. City & County of Honolulu*, 76 F.3d 1009, 1013 n.6 (9th Cir. 1996) (noting, in the context of an as-applied challenge, that the government need not "offer any concrete evidence demonstrating that [the plaintiff's activities] actually" caused the harm the government sought to prevent). The County could reasonably believe that guns are as dangerous at the Nordykes' gun shows as they are at other events on County property.

**[20]** The third prong of the *O'Brien* test simply repeats the threshold inquiry of whether the statute is unrelated to the suppression of free expression, which we addressed above. We therefore move on to the final, fourth prong: that the restriction be no greater than necessary. The Nordykes argue that there are other, less restrictive ways the County could reduce gun violence, such as by using metal detectors. But how would metal detectors prevent gun violence on County property unless County officials could confiscate the guns that those devices discovered? And County officials could not confiscate the weapons or turn away armed visitors unless it were illegal to bring firearms on County property. The County thought it dangerous for people to wander around its property armed. To ban or strictly to regulate gun possession on County land is the only straightforward response to such a danger.

**[21]** We conclude that the Ordinance passes the *O'Brien* test as applied to the Nordykes' gun shows. The district court properly granted summary judgment to the County on this claim.

IV

The Nordykes' final claim alleges a violation of the Equal Protection Clause. It revolves around their suspicion that the exception in the Ordinance for certain artistic events, Alameda Code § 9.12.120(f)(4), was designed to favor groups like the Scottish Games over gun show participants, a favoritism resting on the County's disdain for the "gun culture."

The first part of equal protection analysis is to determine whether the government has classified people. *See Christy v. Hodel*, 857 F.2d 1324, 1331 (9th Cir. 1988). "Once the plaintiff establishes governmental classification, it is necessary to identify a 'similarly situated' class against which the plaintiff's class can be compared. The goal of identifying a similarly situated class . . . is to isolate the factor allegedly subject to impermissible discrimination. The similarly situated group is the control group." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (internal quotation marks and citations omitted).

Section 9.12.120(f)(4) exempts from the Ordinance's reach "[t]he possession of a firearm by an authorized participant in a motion picture, television, video, dance, or theatrical production or event," as long as the participant secures the gun when he is not actually using it. Alameda Code § 9.12.120(f)(4). In other words, the statute distinguishes between those who are authorized participants in the specified productions or events and those who are not. Though this might amount to a classification, the Nordykes cannot point to a similarly situated "control group." The Scottish Games, with their historical reenactments, are a very different kettle of fish from the Nordykes and their gun shows. Crucially, the

Nordykes have not argued that they could meet the exception's requirement that firearms be secured whenever an authorized participant is not actually using them. No wonder. They have admitted that the very nature of gun shows, in which vendors show weapons to prospective buyers and admirers, makes it impossible.

**[22]** We conclude that the Nordykes are not situated similarly to the Scottish Games in that they cannot meet the safety requirements of the exception. The district court was therefore correct to award the County summary judgment on this claim as well.

V

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to the County on the Nordykes' First Amendment and equal protection claims and, although we conclude that the Second Amendment is indeed incorporated against the states, we AFFIRM the district court's refusal to grant the Nordykes leave to amend their complaint to add a Second Amendment claim in this case.

**AFFIRMED.**

GOULD, Circuit Judge, concurring:

I concur in Judge O'Scannlain's opinion but write to elaborate my view of the policies underlying the selective incorporation decision. First, as Judge O'Scannlain has aptly explained, the rights secured by the Second Amendment are "deeply rooted in this Nation's history and tradition," and "necessary to the Anglo-American regime of ordered liberty." The salient policies underlying the protection of the right to bear arms are of inestimable importance. The right to bear arms is a bulwark against external invasion. We should not be

overconfident that oceans on our east and west coasts alone can preserve security. We recently saw in the case of the terrorist attack on Mumbai that terrorists may enter a country covertly by ocean routes, landing in small craft and then assembling to wreak havoc. That we have a lawfully armed populace adds a measure of security for all of us and makes it less likely that a band of terrorists could make headway in an attack on any community before more professional forces arrived.[1] Second, the right to bear arms is a protection against the possibility that even our own government could degenerate into tyranny, and though this may seem unlikely, this possibility should be guarded against with individual diligence. Third, while the Second Amendment thus stands as a protection against both external threat and internal tyranny, the recognition of the individual's right in the Second Amendment, and its incorporation by the Due Process Clause against the states, is not inconsistent with the reasonable regulation of weaponry. All weapons are not "arms" within the meaning of the Second Amendment, so, for example, no individual could sensibly argue that the Second Amendment gives them a right to have nuclear weapons or chemical weapons in their home for self-defense. Also, important governmental interests will justify reasonable regulation of rifles and handguns, and the problem for our courts will be to define, in the context of particular regulation by the states and municipalities, what is rea-

---

[1]English history as summarized by Winston Churchill shows constant recourse to militia to withstand invading forces that arrived not rarely from England's neighboring lands. *See generally* 2 Winston S. Churchill, History of the English Speaking Peoples: The New World (Dodd, Mead, & Co. 1966); 3 Winston S. Churchill, History of the English Speaking Peoples: The Age of Revolution (Dodd, Mead, & Co. 1967). Also, during World War II, when England feared for its survival and anticipated the possibility of a Nazi invasion, its homeland security policy took into account that its Home Guard might slow or retard an offensive, which could come at any point on the coastline, until trained military forces could be brought to bear to repel an invader—because "England was to be defended by its people, not destroyed." *See generally* 1 Winston Churchill, Their Finest Hour 161-76, esp. 174-76 (Houghton Mifflin Co. 1949).

sonable and permissible and what is unreasonable and offensive to the Second Amendment.